## BOWERS v. UNITED STATES.
### No. 11457.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 31, 1952.

Decided Feb. 12, 1953.

Petition for Modification of Judgment
Denied March 16, 1953.

William H. Collins, Washington, D. C., for appellant.

Carl H. Imlay, Atty., Dept. of Justice, Washington, D. C., with whom Charles M. Irelan, U. S. Atty., and Joseph M. Howard, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

William E. Kirk, Jr., Asst. U. S. Atty., Washington, D. C., also entered an appearance on behalf of appellee.

Before CLARK, WILBUR K. MILLER, and BAZELON, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

The indictment in this case was returned under 2 U.S.C.A. § 192, the pertinent part of which is as follows:

"Every person who having been summoned as a witness * * * to

448

give testimony * * * upon any matter under inquiry before * * * any committee of either House of Congress * * * refuses to answer any question *pertinent to the question under inquiry,* shall be deemed guilty of a misdemeanor * * *." (Emphasis added.)

The words of the statute which we have italicized were used advisedly, because Congress knew of course that in hearings before its committees the questioning of witnesses customarily, and probably necessarily, takes a wide range. Committees may and do obtain vague information and receive hearsay evidence from which they form well-grounded suspicions that evils exist at which legislation should be aimed. That is to say, committees' conclusions that corrective legislation should be enacted need not be reached on the basis of relevant and pertinent evidence only. The precision of court procedure is not required. It may often be proper, justifiable and ultimately helpful in the accomplishment of its investigative purposes for a Congressional committee to address to witnesses questions which it cannot demonstrate to be pertinent. But in branding a refusal to answer as a misdemeanor, Congress was careful to provide that the question must be "pertinent to the question under inquiry." It follows that, when a witness refuses to answer a question and the government undertakes to convict him of a criminal offense for not answering, then pertinency must be established. Presumption or possibility of pertinency will not suffice.

In discussing a prosecution under the statute which is involved here, the Supreme Court said "a witness rightfully may refuse to answer * * * where the questions asked are not pertinent to the matter under inquiry." Sinclair v. United States, 1929, 279 U.S. 263, 292, 49 S.Ct. 268, 271, 73 L.Ed. 692. In the same opinion, 279 U.S. at page 296, 49 S.Ct. at page 273 the Court said the presumption of pertinency without proof, if there be such a presumption, is overcome by the stronger presumption of innocence, and that it is

"therefore incumbent upon the United States to plead and show that the question pertained to some matter under investigation."

Obviously, then, the pertinency of the question is an essential ingredient of the offense, and one may not be convicted of violating the statute unless the government shows the question he refused to answer pertained to some matter being investigated.

The indictment against the appellant, which was in seven counts, charged generally that on February 16, 1951, when he appeared as a witness before a duly created subcommittee of the Senate's Special Committee to Investigate Organized Crime in Interstate Commerce, Bowers unlawfully refused to answer seven questions, "all of which were pertinent to the question then under inquiry before the subcommittee." Each question was set out in a separate count and Bowers was found guilty under all of them.

We first take up Count 1 of the indictment, which is as follows:

" 'What business did you engage in in Chicago?' (the meaning of the question being, as the defendant knew, What business did the defendant engage in in Chicago during the year 1927)."

The initial step in determining the pertinency of the question is to ascertain the subject matter of the inquiry then being conducted by the subcommittee. Senate Resolution 202, 81st Cong., 2d Sess., created the Special Committee to Investigate Organized Crime in Interstate Commerce and authorized and directed it

"* * * to make a full and complete study and investigation of whether organized crime utilizes the facilities of interstate commerce or otherwise operates in interstate commerce in furtherance of any transactions which are in violation of the law of the United States or of the State in which the transactions occur, and, if so, the manner and extent to which, and the identity of the persons, firms, or corporations by which such utilization

is being made, what facilities are being used, and whether or not organized crime utilizes such interstate facilities or otherwise operates in interstate commerce for the development of corrupting influences in violation of law of the United States or of the laws of any State * * *."

So, according to the record before us, the matter under investigation by the subcommittee was the activity *vel non* of organized crime through the facilities of interstate commerce. The pertinency of the question covered by Count 1 depends, therefore, on whether the answer to that question would aid the subcommittee in ascertaining the extent, if any, to which organized crime operates in interstate commerce and the nature of such operations, if any. Our view is that, on its face, the question was not pertinent to that inquiry, for we are unable to see how an investigation into the activities of organized crime in interstate commerce which was being conducted in 1951 would be furthered in any way by the subcommittee's knowledge of what business Bowers engaged in in Chicago some twenty-four years before. Nor does the context of the question indicate its pertinency, as will be seen by an excerpt from the transcript of the proceedings before the subcommittee which is reproduced in the margin.[1]

While it was the duty of the trial court to determine as a matter of law whether the question was pertinent, that determination could only be made from a factual showing by the government, since the question and the answer for which it called, standing alone, did not pertain to the subject under inquiry. We find in the record not the slightest showing by the prosecution that the nature of Bowers' business in Chicago in 1927 pertained to, or would shed any light upon, the activities of organized crime in 1951.

The government's only witness was Downey Rice, the attorney who interrogated Bowers at the hearing before the subcommittee. He identified and quoted from the transcript of the hearings and spoke of an earlier informal conversation with Bowers, but gave no hint of how the Count 1 question could possibly have been

---

1. Proceedings Against George L. Bowers for Contempt of the Senate, Sen.Rep. 204, 82d Cong., 1st Sess. 4 and 5 (1951):

    "Mr. Rice. When did you first go to Chicago?

    "Mr. Bowers. I think my first trip to Chicago was in 1927.

    "Mr. Rice. 1927?

    "Mr. Bowers. Right.

    "Mr. Rice. What business did you engage in in Chicago?

    "Mr. Bowers. Mr. Rice, I am indicted in Miami now on account of gambling, and I stand on my constitutional rights. I won't answer any questions that will tend to incriminate myself.

    "Mr. Rice. Sir?

    "The Chairman. The question was what business did you engage in in Chicago?

    "Mr. Bowers. Well, that is the reason I refuse to answer that question, Your Honor.

    "The Chairman. Well, the Chair directs you to answer that.

    "Mr. Bowers. Sir?

    "The Chairman. I say I direct you to answer that question.

    "Mr. Bowers. I can't answer that question.

    "The Chairman. You refuse to answer it?

    "Mr. Bowers. Yes, sir; I stand on my constitutional rights.

    "Mr. Rice. No[w], then, sir, this offense that you have in mind, is that a State offense or is that a Federal offense?

    "Mr. Bowers. That is a State offense. There is no Federal laws against gambling that I know of.

    "Mr. Rice. I see. So that you are claiming a privilege on a State offense, is that correct?

    "Mr. Bowers. Yes, sir; that will tend to incriminate me down there in the case.

    "Mr. Rice. Now, sir, what connection would what you were doing in 1927 in Chicago have, or what connection is there with the matter that you are now under indictment for? Is there any connection between those two things?

    "Mr. Bowers. I refuse to answer that question. I stand on my constitutional rights.

    "Mr. Rice. Have you ever heard of the statute of limitations?

    "Mr. Bowers. I never did. If you tell it to me, then it might clear some things."

pertinent. If he or the subcommittee had some background of information which led them to conclude that the nature of Bowers' business in Chicago in 1927[2] pertained to the business which the subcommittee had in hand in 1951, such background was not revealed to the trial judge. Nevertheless, the charge to the jury contained this language:

"I instruct you as a matter of law that the questions which the indictment alleges were asked of the defendant, and all of them, were pertinent to the question then under inquiry before the subcommittee, as it is alleged in the indictment."

After the completion of the charge, the judge inquired whether there were exceptions to it, whereupon appellant's counsel, among other things, said:

"* * * Of course, consistent with the position I have taken previous to this time, I, of course, object to the charge in saying that the questions were pertinent."

The exception seems to us to have been well taken. The question embraced in Count 1 was clearly not pertinent, standing alone or in context, and no showing of pertinency was made, although it was "incumbent upon the United States to plead *and show* that the. question pertained to some matter under investigation." (Emphasis supplied.) In the absence of such a showing, the jury should have been directed to find Bowers not guilty under that count.

We turn to Count 2, which is as follows:

" 'My question is what did you earn the money doing?' (the meaning of the question being, as the defendant knew, What did the defendant do to earn the five thousand dollars which he paid in 1942 for a ten per cent interest in the Little Palm Restaurant in Florida)."

2. He made his first visit to Chicago in 1927. He did not say, and it was not shown, that he lived in or engaged in business in that city in that year.

This question was immediately preceded by the following interchange (Proceedings, supra note 1, at page 7):

"Mr. Rice. * * * Where did you get the $5,000?

"Mr. Bowers. I had earned it.

"Mr. Rice. What doing?

"Mr. Bowers. Now, I paid income taxes on it. You got the papers; you can look at it."

The background of the question was that Bowers had just said that in 1942 he had paid $5,000 for an interest in the Little Palm Restaurant in Florida. So he was being asked how he had earned the sum of $5,000, net after taxes, which he invested in 1942 and which he must have earned earlier in that year or in some prior year or years. This question does not appear on its face to pertain to the investigation which was being conducted in 1951 into the activities of organized crime in interstate commerce. It may have been in fact in some remote way pertinent to that inquiry but, if so, the government made no effort to establish that fact.

Counts 3 and 4, which contain related questions, are as follows:

3. "Well, you have an interest in the Sunny Isles, don't you?"

4. "From whom did you acquire your interest in the Sunny Isles?"

Sunny Isles, although not identified in the record, presumably was a bar and restaurant in Florida, since other establishments of that nature were being discussed at that point in Bowers' examination. It may have been a gambling place[3] and therefore the two questions may have somehow pertained to the interstate activities of organized crime; but standing alone the questions were not pertinent to that subject and the prosecution made no attempt to connect them.

Count 5 follows:

3. The witness Rice testified the subcommittee had "some information, some notion that Sunny Isles was a gambling casino."

---

"Well, on the checks that were drawn by the Sunny Isles, doesn't Leo Levitt countersign the checks?"

The record does not disclose the identity of Leo Levitt, and the court was not told how his countersignature on Sunny Isles' checks related to the matters under investigation.

In Counts 6 and 7 Bowers was indicted twice, and thereunder was convicted twice, for refusing to answer the same question. We quote the counts:

6. "Do you know William Johnston?"

E. "'Do you know him?' (the meaning of the question being, as the defendant knew, Did the defendant know William Johnston)."

The attorney who was interrogating Bowers described William Johnston as "The man that is president of four dog tracks in Florida" and then asked Bowers this cryptic question: "Sportsman's Park, Chicago?" This is the only identification of William Johnston given to Bowers. Had the question been repeated fifty times, and had Bowers been accused in and convicted under as many counts, he could have been sentenced to virtual life imprisonment for refusing to say whether he knew the president of four dog tracks in Florida.

In addition to the subcommittee counsel's suggestion that the William Johnston about whom he was inquiring held those four positions, there was before the trial judge an interim report filed by the committee on August 18, 1950, which contained a statement of the subcommittee's impressions concerning Johnston. We quote from the interim report: [4]

### "Chicago gang 'muscles in'

"A second and much larger encroachment on the local operation of the S & G Syndicate took place in 1949 after the election of Gov. Fuller Warren.

"In January of 1949, there appeared in Miami a special investigator for the Governor, named W. O. Crosby. He proceeded to the office of Sheriff Jimmy Sullivan of Dade County and asked for assistance in conducting raids on certain gambling establishments. The places raided were all S & G bookies. Crosby admitted on cross-examination that he received his information from Harry Russell, well-known Chicago racketeer, and associate of Capone syndicate members, with whom he stated he became friendly. He did not make the acquaintance of any of the S & G members. A mutual friend of Crosby and Russell was William H. Johnston, who has had a long career of close association with Chicago racketeers of the Capone gang, and who was one of the three men who each contributed large sums of money to the campaign fund of Governor Warren. During the Crosby investigation Crosby met with Johnston on several occasions and Russell also met with him at least once, but Johnston denies that they discussed the investigation."

This excerpt from the interim report requires some examination. The S & G Syndicate appears to have been an association of bookmakers which doubtless used interstate wires in obtaining racing information. The subcommittee seems to have suspected Governor Fuller Warren, of Florida, was conspiring with Harry Russell, described as a "well-known Chicago racketeer," to have his investigator, Crosby, help Russell and his associates to "muscle in" on the operation of the S & G Syndicate. The interim report describes William Johnston as a mutual friend of Crosby and Russell, who had long been closely associated with the Capone gang of Chicago and who had contributed a large sum of money to Governor Warren's campaign fund. It will be noted that the report does not accuse Johnston of conspiring with Crosby, Russell, and the Governor except for the innuendo to that effect which inheres in the statement that Johnston had made a large contribution to the Governor's campaign fund.

4. Sen.Rep. 2370, 81st Cong., 2d Sess. 12 (1950).

Except for the suggestion that Johnston was the president of four dog tracks in Florida, the foregoing was the only material concerning him which was before the trial judge when he ruled the questions pertinent. So the inquiry is whether the question posed to Bowers, "Do you know William Johnston?" pertained to the activities of organized crime in interstate commerce. We seriously doubt whether the "Do-you-know-a-certain-person" question, without more, can ever be said to be pertinent for the purposes of a criminal prosecution under § 192.

But whether so or not, it seems clear that pertinency was not shown here. One may be said to know another after a mere formal introduction or through the most casual acquaintance. Had it been shown, as it was not, that Johnston was engaged in some interstate criminal activity, whether Bowers had ever met him could not have pertained to the matter under investigation. In a sense the subcommittee seems to have accused Bowers of guilt through casual acquaintance, which is even worse than guilt by association. Moreover, we note that Bowers said to the subcommittee with reference to Johnston, "I don't know anything about him."

■ It may be suggested that, when Bowers was being examined before the subcommittee, he did not assign lack of pertinency as his reason for refusing to answer the seven questions, and so waived that defect. The answer to such a suggestion is that the right to refuse to answer a question which is not pertinent is not a personal privilege, such as the right to refrain from self-crimination, which is waived if not seasonably asserted; but that pertinency is an element of the criminal offense which must be shown by the prosecution. Christoffel v. United States, 1949, 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826, involved a prosecution for perjury before a Congressional committee under a perjury statute which required that a "competent tribunal" be present when the false statement is made. The Supreme Court said, 338 U.S. at page 89, 69 S.Ct. at page 1450:

"We are measuring a conviction of crime by the statute which defined it. * * * An essential part of a procedure which can be said fairly to inflict * * * punishment is that all the elements of the crime charged shall be proved beyond a reasonable doubt. An element of the crime charged in the instant indictment is the presence of a competent tribunal * * *."

Christoffel's conviction was reversed because the government had not proved the presence of a majority of the committee at the time of the alleged perjurious testimony. Christoffel did not raise before the committee the point of no quorum. See also United States v. Bryan, 1950, 339 U.S. 323, 328–330, 70 S.Ct. 724, 94 L.Ed. 884.

■ It should be borne in mind that when Bowers appeared for trial in the District Court he was presumed to be innocent, and that presumption remained with him throughout the trial. The United States had the task of proving his guilt beyond a reasonable doubt, and a part of that task was to show the pertinency of the questions he refused to answer, since pertinency was not apparent from the questions themselves. Some of the seven questions may well have been pertinent, and it might have been possible for the government to show pertinency. But the important fact is that it did not do so.

■ It will not do to say the questions were preliminary in nature and, had they been answered, would have led to and been followed by questions plainly pertinent, for on that theory pertinency need never be shown in a prosecution under the statute. It could always be said the questions were preliminary. The indictment charged the seven questions were themselves pertinent; the allegation is not sustained by a mere possibility that they might have led to later relevant questions.

■ We have not failed to note that in the Sinclair case, 1929, 279 U.S. 263 at page 298, 49 S.Ct. 268, 73 L.Ed. 692, the Supreme Court said, "the question of pertinency does not depend upon the probative

value of evidence. But it also said, 279 U.S. at page 296, 49 S.Ct. at page 273, that because of the stronger presumption of innocence, a presumption of regularity (i. e., pertinency) is insufficient without proof and that the United States must "plead and show that the question pertained to some matter under investigation." And in 279 U.S. at page 299, 49 S.Ct. at page 273, the Court said:

"* * * The matter for determination in this [Sinclair] case was whether the facts called for by the question were so related to the subjects covered by the Senate's resolutions that such facts reasonably could be said to be 'pertinent to the question under inquiry.' It would be incongruous and contrary to well-established principles to leave the determination of such a matter to a jury."

But again we point out that the Sinclair case says the United States must plead and show pertinency. This means, we think, that when a question is not in itself or because of its context plainly pertinent, the United States must somehow show its pertinency to the court; and if it does not do so, the court may not hold the question pertinent as a matter of law.

In a case like this, the trial judge has no more right to presume pertinency without proof than a jury has to guess at guilt. Since pertinency was not shown here a verdict of not guilty as to all counts should have been directed. Upon remand, the District Court should enter a judgment of acquittal.

Reversed and remanded.

BAZELON, Circuit Judge (concurring).

The court's opinion, to which I subscribe, calls to mind my statement in Quinn v. United States that a "conclusive presumption of intent to violate the statute *might* attach to a naked refusal to answer, *i. e.,* a refusal without a statement, at the time, of the reason therefor." [1] The present decision illustrates an implicit limitation on the application of that principle. It

makes clear that no such presumption would attach to a refusal to answer a question not shown to be "pertinent to the question under inquiry."

---

1. 91 U.S.App.D.C. 344, 203 F.2d 20, 33. (Emphasis supplied).