Merrimack,
No. 4395.

LOUIS C. WYMAN, *Attorney General*

*v.*

PAUL M. SWEEZY.

Argued January 3, 1956.

Decided March 6, 1956.

*Louis C. Wyman*, Attorney General (by brief and orally), *pro se.*

*Sheehan, Phinney & Bass* (*Mr. Phinney* orally), for the defendant.

*Joseph A. Millimet* (by brief and orally), as *amicus curiae.*

*George Soll* (of New York) for the Academic Freedom Committee of American Civil Liberties Union, as *amicus curiae.*

GOODNOW, J. The Attorney General was chosen by the Senate and House of Representatives as a legislative committee to make an investigation "with a view to providing [the Legislature] with information upon which further action by it may be predicated." *Nelson* v. *Wyman*, 99 N. H. 33, 37, 38. The matters concerning which it was authorized to inquire were limited to those "relevant and pertinent to the main object of the investigation." *Id.*, 39. The questions asked of a witness appearing before it must likewise fall within this limitation. If they do not, they are irrelevant and

need not be answered. When the relevancy of inquiries made of him are questioned by a witness and he declines to answer, the committee may then petition the Superior Court, as it did in this case.

The principal purpose of an action commenced by such a petition is the determination of the relevancy of those questions put to the witness which he has declined to answer. The petition does not seek to have the defendant found in contempt of the investigating committee nor "to vindicate public authority," as he claims. Instead, it "seeks to have the Superior Court propound to the defendant the same questions as were asked him by the Attorney General and in the event he persists in the same answers that he be adjudged *in contempt of the Superior Court."* (Emphasis supplied). *State* v. *Uphaus,* 100 N. H. 1, 3. In connection with the petition, the Superior Court is authorized "to proceed in the matter as though the original proceedings had been in the court." RSA 491:20. It is thereby granted jurisdiction over the investigation to the extent required by the subject matter of the petition. *State* v. *Uphaus, supra,* 3, 4. Within that area, the Court may order the defendant to answer questions which it deems to be relevant according to the standards applicable in legislative investigations.

The relevancy of questions asked by an investigating committee is not to be determined solely by the standards applicable at the trial of issues in court. "Because of the scope and purpose of [legislative] investigations, pertinency . . . is necessarily broader than relevancy in the law of evidence." *United States* v. *Orman,* 207 F.(2d) 148, 153. It is not so broad, however, that a question may be sustained as relevant on a mere possibility that it might lead to later relevant questions. *Bowers* v. *United States,* 202 F. (2d) 447, 452. The joint resolution authorizing the investigation is the guide to relevancy. If the question is directed at a possible answer (*United States* v. *Orman, supra,* 154) which would be reasonably concerned with the main object of the investigation, it is relevant. See *Sinclair* v. *United States,* 279 U. S. 263, 299.

Unless the relation of a particular question is apparent on its face, the burden of establishing its relevancy rests upon the Attorney General. In support of his assertion of relevancy, he is not confined, however, to "the rules of evidence and the presumptions of law applicable in criminal cases," as contended by the defendant. Relevancy, as it applies to a legislative investigation,

may stem from a wide variety of factors. The context in which a question is asked may indicate its relevancy. *Bowers* v. *United States*, 202 F.(2d) 447, 449. If it does, the transcript of the defendant's entire testimony before the committee may alone furnish a sufficient basis for the Court's decision.

In this case, when the Attorney General, as the investigating committee, put the questions to the defendant, he possessed information concerning the defendant's published writings, the persons with whom he had been associated, and his apparent activities in certain organizations. The Attorney General had also acquired in the course of his investigation a knowledge of the tenets of the Communist Party and the methods and operations of Communists and their sympathizers. Background information of this sort may also indicate the relation of questions asked by the committee to the subject matter of the investigation. *United States* v. *Orman*, 207 F.(2d) 148, 155. If considered to reasonably do so by the Court to which it is disclosed, it may furnish a sufficient basis for determining relevancy.

In connection with a lecture entitled "Socialism" given by the defendant as a guest lecturer before a student class at the University of New Hampshire in March, 1954, he was asked "What was the subject of your lecture?" This question the defendant declined to answer and replied: "I stated under oath . . . that I do not advocate or in any way further the aim of overthrowing constitutional government by force and violence. I did not so advocate in the lecture I gave at the University of New Hampshire. In fact, I have never at any time so advocated in a lecture anywhere. Aside from that I have nothing I want to say about the lecture in question." He also refused to answer the following questions: "Didn't you tell the class at the University of New Hampshire . . . that Socialism was inevitable in this country? . . . Did you express the opinion, or did you make the statement at that time that Socialism was inevitable in America? . . . Did you advocate Marxism at that time . . . ?" and "Did you in this last lecture on March 22 or in any of the former lectures espouse the theory of dialectical materialism?" Upon consideration of the transcript of the hearings before the Attorney General and arguments of counsel, the Superior Court ruled these questions to be "relevant under the statute under which the Attorney General is acting" basing its ruling "upon the sections in the statute which relate particularly to teaching or advocating Communism."

The statute referred to (RSA ch. 588) provides that persons who advocate or teach "any person to commit, attempt to commit, or aid in the commission of any act intended to overthrow, destroy or alter" existing government by force or violence are either classified as subversive persons by section 1 or are subjected to criminal penalties by section 2, depending upon whether such advocacy or teaching has been done "knowingly and wilfully . . . under such circumstances as to constitute a clear and present danger." (S. 2). *Nelson* v. *Wyman*, 99 N. H. 33, 37.

"It is not always easy to distinguish teaching or advocacy in the sense of incitement from teaching or advocacy in the sense of exposition or explanation." *Dennis* v. *United States*, 341 U. S. 494, 572. The distinction is one of fact. The defendant's denial that he advocated, taught or in any way furthered the aim of overthrowing constitutional government by force or violence in his lecture is simply his determination of that fact, which the committee could believe or not as it saw fit. The witness could not by his answer impose upon the investigating committee the burden of producing evidence that a doctrine aimed at the violent overthrow of existing government was in fact advocated by him before it could inquire of him concerning the lecture.

An examination of the transcript and the background information furnished to the Court by the Attorney General discloses that the defendant is a socialist and for several years has advocated "the classical conception of socialism: public ownership of the means of production and general economic planning," a system which he stated exists today only in Communist countries. He testified that he does not advocate the use of force or violence to establish this system in this country as was done in Russia and China, that he considers himself to be a Marxist in the sense that "Marxism is a body of doctrines about society, history and philosophy . . . not a form of society" and that he is not a member of the Communist Party, has never been one and knows no members of it in this state. He acknowledged past and present affiliations with various organizations and committees which have either been designated by the Attorney General of the United States as subversive or reported by the Committee on Un-American Activities of the United States House of Representatives to be dominated by members of the Communist Party.

The record also discloses that in 1953, the defendant was co-editor of an article appearing in a publication known as the

Monthly Review which reads in part as follows: "Our Country is preparing to practice violence on a hitherto undreamed-of scale to preserve a social order . . . Capitalism, the organization of society according to the barbaric principle of private profit, is the scourge of mankind; and violence designed to preserve it is doubly damned, once for itself and once for its purpose. Those of us who have socialism in our bones . . . must necessarily judge the violence of the socialist countries differently. We hate it . . . but history . . . decreed that the economic foundations of the society of the future must be laid in backward countries, not only without the assistance of the advanced countries but against their ruthless and implacable resistance. It was thereby rendered inevitable that the process should be difficult, painful and violent. But the process does go forward — of that the majestic successes of the Soviet economy . . . is irrefutable proof . . . For the first time in history we can say that violence is being used to protect regimes which are doing their utmost to create a society which will be able to dispense with violence. That makes all the difference."

Against this background, the Attorney General was reasonably warranted in making his inquiry. The questions concerning the subject matter of the defendant's lecture and those directed at ascertaining what, if anything, the defendant said about Marxism and about the inevitability of socialism in this country were clearly relevant to aid the committee in determining whether the defendant had, either "knowingly and wilfully" or otherwise, advocated or taught the overthrow, destruction or alteration of existing government by force or violence.

Whether the defendant's lecture espoused dialectical materialism was equally relevant. According to the History of the Communist Party of the Soviet Union, introduced as an exhibit by the Attorney General at the hearing before the Court, "dialectical materialism is the world outlook of the Marxist-Leninist party." Standing alone, espousal of only one of several tenets of the communist faith would not necessarily establish advocacy of all communist beliefs including those concerned with overthrow of existing government by force and violence. On the other hand, in determining whether a lecture concerned with Socialism and Marxism, as defined by the defendant, went so far as to include advocacy of force and violence, the espousal of dialectical materialism would have some tendency to indicate that there may also have been an endorsement of the doctrines of the Communist Party.

In addition to specific rulings concerning the questions asked of the defendant about his lecture, the Superior Court also ruled that "the Attorney General is entitled to inquire into the actual contents of any lecture given at any school." This ruling was not essential to the case. It seems appropriate to note in this opinion, however, that it is incorrect standing alone and without qualification. Neither the resolution authorizing this investigation nor the statute to which it refers contains any special directive, express or implied, concerning schools or lectures given at schools.

The authorization given to the Attorney General to act "upon such information as in his judgment may be reasonable or reliable" (Laws 1953, c. 307) limits the school lectures about which he may inquire to those concerning which he possesses reasonable or reliable information indicating that the violent overthrow of existing government may have been advocated or taught, either "knowingly and wilfully" or not. See *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 209. It does not, and could not legally, authorize him to examine private citizens indiscriminately in the mere hope of stumbling upon valuable information. *Orman* v. *United States*, 207 F.(2d) 148, 155.

One of the matters as to which the Attorney General was directed to inquire was the existence of subversive organizations in this state in violation of the subversive activities act. In seeking to determine whether the Progressive Party in New Hampshire, and its predecessor, an organization known as the Progressive Citizens of America, might be or have been subversive organizations, the Attorney General asked the following questions of the defendant: "Was . . . your wife active in the formation of the Progressive Citizens of America? . . . Was [she] then working with individuals who were then members of the Communist Party? . . . Was Charles Beebe active in forming the Progressive Citizens of America? . . . Was Charles Beebe active in the Progressive Party in New Hampshire? . . . Did Charles Beebe work with your present wife in 1947?" and, in connection with a visit of the defendant to the home of Abraham Walenko, "Did it have anything to do with the Progressive Party?"

The defendant has admittedly been active in the Progressive Party. He handled most of its relations with the national office and was a candidate for presidential elector on its ticket in this state in 1952. He offered to answer questions concerning the activities of any person known to him "if such person were

identified as a subversive or a communist as defined in the" subversive activities act but declined to answer the questions in controversy as irrelevant, on the grounds that the persons inquired about were not so identified and because the Progressive Party is and was a lawful political organization concerning which no right of inquiry existed.

The statute defines a "subversive organization" as any group of persons associated together for joint action, including a political party, which engages in or advocates or teaches "activities intended to overthrow, destroy or alter" existing government by force or violence. RSA 588:1. Persons who "knowingly and wilfully" assist in the formation, participate in the management or contribute to the support of such an organization, knowing it to be such, are subject to criminal penalties. RSA 588:2(d). Persons who are members of such an organization not "knowingly or wilfully" or are members without knowing the nature of the organization, are classified as subversive persons. RSA 588:1.

The fact that the Progressive Party "is, if still extant, or certainly was, a lawful political organization," as asserted by the defendant, did not preclude inquiry by the Attorney General concerning its purposes and activities until it was shown to be a subversive organization. Under the joint resolution authorizing this investigation, the Attorney General is not authorized to inquire indiscriminately concerning organizations in this state. Only when he possesses "reasonable or reliable" information indicating that an organization may have as one of its purposes, or may be engaged in activities aimed at, the violent overthrow of existing government, is he empowered to inquire into the purposes, activities and membership of that organization. That he did possess information which was sufficient to reasonably warrant inquiry concerning the Progressive Party is evident from his statement made during the hearings held before him that "considerable sworn testimony has been given in this investigation to the effect that the Progressive Party in New Hampshire has been heavily infiltrated by members of the Communist Party and that the policies and purposes of the Progressive Party have been directly influenced by members of the Communist Party." See *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 209.

Whenever evidence has been received by the committee concerning a particular organization which indicates a reasonable need for further inquiry to determine whether that organization is or is not

a subversive one, questions concerned with its activities and purposes as well as those concerned with membership or participation in it by named persons are necessarily relevant. The policies of an organization are established by its members, or sometimes by a small minority of its members. Information as to policies may be obtained in some instances from those members who have participated in the making of them. On the other hand, if subversive purposes actually exist, the witness may not fully disclose his knowledge concerning them and other methods must be used to determine their existence. The extent to which members of the Communist Party are included in the membership of an organization and are active in controlling its policies is clearly related to the question of whether the organization is subversive. A person who has been active in an organization, as was the defendant in the Progressive Party, is a natural source from which the committee may acquire information concerning the purposes of the organization or the identity of those members who established them.

It is on information of this sort that a determination concerning the nature of an organization may be made by a legislative investigating committee. Whether the persons referred to in the questions were or were not in fact Communist Party members or subversive persons is not decisive of the issue of relevancy and the defendant was not entitled to proof of that fact before being required to answer. The questions called for answers concerning the membership or participation of named persons in the Progressive Party which, if given, would aid the Attorney General in determining whether that party and its predecessor are or were subversive organizations. They were accordingly relevant to the subject matter of the investigation.

The resolution authorizing the investigation is not so vague and lacking in standards as to violate the defendant's right to due process. The Attorney General is not authorized to act on the basis of rumors but only upon information which is "reasonable or reliable." See *Oklahoma Press Publishing Co. v. Walling, supra,* 216, 217. Nor is the relevancy of the questions which he is entitled to ask established by "the wheels that go around in the Attorney General's mind." As we have previously noted in this opinion, the questions which may be put to a witness must be directed at a possible answer which would be reasonably concerned with a main object of the investigation. Those objects are set forth in the resolution as follows: "to make full and complete investigation

with respect to violations of the subversive activities act of 1951 and to determine whether subversive persons as defined in said act are presently located within this state." Laws 1953, c. 307. The sections of the act to which reference is made, and with which the circumstances of this case are concerned, define subversive organizations and persons (RSA:588, 1) and the acts of advocacy and teaching (*Id.*, 2(b)) and participation in a subversive organization (*Id.*, 2 (d)) which are made criminal with sufficient clarity to satisfy the requirements of due process. *Nelson* v. *Wyman*, 99 N. H. 33.

It is important to note that the Attorney General is without authority to compel testimony. If he undertakes to act without a basis of reasonable or reliable information, the witness can refuse to answer. If a basis for inquiry exists but the questions which he asks are irrelevant, the witness can also refuse to answer. In either of these events, the Attorney General must, if he insists upon proceeding or receiving an answer to his questions, apply to the Superior Court for a determination of the disputed matter. Unlike the situation which prevails in criminal proceedings for contempt of a Congressional investigating committee (see *Bowers* v. *United States*, 202 F.(2d) 447), our procedure not only requires a determination by the Superior Court of the reasonableness of the Attorney General's basis for acting, if that question is disputed, and the relevancy of the questions to which answers have been refused but also an opportunity for the witness to answer such questions as have been found relevant by the Court, before a witness can be punished for contempt.

The right to lecture and the right to associate with others for a common purpose, be it political or otherwise, are individual liberties guaranteed to every citizen by the State and Federal Constitutions but are not absolute rights. 29 Ind. L. J. 162, 167. The inquiries authorized by the Legislature in connection with this investigation concerning the contents of the lecture and the membership, purposes and activities of the Progressive Party undoubtedly interfered with the defendant's free exercise of those liberties. He contends that there is no rational basis here for this interference. The issue thus raised involves a conflict between the principles underlying the broad and extensive investigative powers of the Legislature and those upon which the individual rights guaranteed by the Constitution are based. The answer lies in a determination of whether the object of the legislative investigation under considera-

tion is such as to justify the restriction thereby imposed upon the defendant's liberties. *Nelson* v. *Wyman,* 99 N. H. 33, 41. See *American Communications Ass'n* v. *Douds,* 339 U. S. 382, 397-400.

The restrictions upon the defendant's freedoms with which we are here concerned result from the investigation authorized by the Legislature and not from legislation directly limiting those freedoms, such as was considered in *Nelson* v. *Wyman,* 99 N. H. 33, 49, 50. "There is a vast difference between the necessities for inquiry and the necessities for action. The latter may be only when danger is clear and present, but the former is when danger is reasonably represented as potential." *Barsky* v. *United States,* 167 F. (2d) 241, 247.

The problem of determining whether the threat of subversive activities in this state was sufficiently great to require an investigation and the consequent limitations upon civil liberties was resolved by the Legislature. Its adoption of the resolution authorizing the investigation was its judgment that the danger to existing government posed by subversive activities is potential. We have not changed our views of the Legislature's right to reach that judgment since our opinion in the *Nelson* case in which we upheld "the Legislature's decision to inquire of residents concerning activities aimed at the overthrow of government by force and violence, whenever they occurred." *Id.,* 42. The limits of the investigation are subject to control by the Trial Court and therefore should offer no opportunity for any official to "prescribe what shall be orthodox in politics, nationalism, religion or other matters of opinion" as claimed by the defendant, nor permit the exposure of witnesses to unfavorable publicity for the mere sake of exposure. Any stultifying effect which the investigation may have upon freedom of expression or any restriction which it may impose upon freedom of association will be in the limited area in which the legislative committee may reasonably believe that the overthrow of existing government by force and violence is being or has been taught, advocated or planned, an area in which the interest of the State justifies this intrusion upon civil liberties. The inquiries which the defendant was directed to answer in this case came within this area.

*Exceptions overruled.*

All concurred.