**UNITED STATES of America**

v.

**Frank W. BREWSTER.**

**Cr. No. 289.**

United States District Court
District of Columbia.
June 26, 1957.

128

William Hitz, Asst. Dist. Atty., Washington, D. C., for the Government.

John K. Pickens, Jerry N. Griffin and Robert E. Watkins, Washington, D. C., for defendant.

SIRICA, District Judge.

The indictment in this case charges that defendant violated § 192 of Title 2 of the United States Code when he failed to produce certain records subpoenaed by a subcommittee of the Congress and, though directed to testify, refused to answer certain pertinent ques-

tions put to him by the committee. The statute reads in part as follows:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, * * *."

In January of 1957, the Permanent Subcommittee on Investigations of the Committee on Government Operations, United States Senate, held investigative hearings under the authority of the Legislative Reorganization Act of 1946 and pursuant to Senate Resolution 188, 84th Congress. These hearings formed part of a series entitled: "Violation or Non-enforcement of Government Laws and Regulations in the Labor Union Field". High officials of the Department of Labor and the National Labor Relations Board had already revealed to the subcommittee the inadequacy of present laws with respect to financial reports filed with these agencies by labor organizations. Furthermore, conferences with representatives of the Bureau of Internal Revenue raised doubts as to the present policy of granting a blanket tax exemption to all labor unions without any assurance that the funds of a given union are being honestly handled. Previous inquiries had disclosed that manipulation of union funds by racketeering officials had raised the prices on many Government purchases. It was the hope of the subcommittee that the facts to be developed in the hearings would enable the Congress to decide whether any change in the statutes or in administrative procedures would better the efficiency of these agencies.

As part of its check into unreported dealings with union funds by officials in the Western Conference of Teamsters, the subcommittee issued subpoenas to defendant as president of the Western Conference of Teamsters, and as president of Joint Council No. 28, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers, both located in Seattle, Washington. The requirements of both subpoenas were substantially the same, and they directed the defendant to appear before the subcommittee to testify on December 27, 1956 and to produce the books and records of both the Western Conference and of Joint Council 28. By mutual agreement, the date was postponed to January 16, 1957. On that day, defendant was sworn as a witness, but failed to produce any of the documents subpoenaed, and refused to answer questions. He contended that the committee was acting beyond its authority, and that the subpoena was so broad and lacking in particularity as to amount to an unreasonable search and seizure in violation of the Fourth Amendment. The Chairman then dismissed the witness for later recall. Three days later, the witness appeared again without the subpoenaed papers, and this time adamantly refused to reply to subcommittee questioning. By Senate Resolution 92, 85th Congress, First Session, dated February 19, 1957, defendant was cited for contempt of the Senate. After indictment by the Grand Jury, the case was tried by this Court. All parties consented to trial without jury.

The indictment contains thirty-one counts falling into five major groups. Eleven counts deal with refusals to verify or identify documents filed with the Secretary of Labor by Joint Council 28 and Local 174 of the Teamsters Union (Counts 2, 3, 4, 9, 10, 11, 12, 13, 16, 17 and 19). Seven counts involve inquiries into the actual, as distinguished from the reported, utilization of union funds (Counts 18, 20, 21, 22, 23, 24 and 25). Defendant also refused to respond to seven questions concerning his intent and purpose in challenging the authority of the subcommittee (Counts 5, 6, 7, 8,

26, 27 and 30). Three questions concerned the instructions circulated among officials of the International Brotherhood of Teamsters that no disciplinary action was to be taken against any official who invoked his constitutional privileges (Counts 14, 15 and 31). Two counts charge defendant with failing to obey the two subpoenas mentioned above (Counts 28 and 29). According to the first count, defendant refused to tell the subcommittee his occupation. In every instance, the Chairman overruled defendant's objections and directed him to answer.

Throughout the trial, defendant's main contentions were: First, that alleged racketeering in the Western Conference of Teamsters was clearly beyond the scope of committee authority; second, that the questions contained in the indictment were not pertinent to the question under inquiry; third, that the subpoenas duces tecum violated the Fourth Amendment as being too broad, sweeping and lacking in particularity; fourth, that when defendant later appeared before the Senate Select Committee on Investigation of Improper Activities in Labor-Management Relations and answered questions similar to those found in the indictment, and when he opened up union files to that Committee, he had "purged" himself of any contumacy regarding the Permanent Subcommittee on Investigations; fifth, that the only motive of the subcommittee in conducting its inquiry was to expose and publicize alleged racketeering in unions; and sixth, that testimony of the chief counsel of the subcommittee was inadmissible as evidence. For reasons now given, the Court rejects each of these contentions.

The first step in resolving the issues presented is to ascertain with all practicable precision the nature and scope of the "question under inquiry" as it is phrased in the statute. The title, the introductory remarks of the Chairman, and the general nature of the hearings furnish reliable guidance. Compare Watkins v. United States, 77 S.Ct. 1173.

The official title of the investigation was "Violation or Nonenforcement of Government Laws and Regulations in the Labor Union Field". At the first session on January 16, 1957, the Chairman read a prefatory statement and this statement was given out to all interested parties including defendant and his counsel. It states, in part, as follows:

" * * * In the course of its (prior) investigation, facts were developed showing collusion between certain dishonest management and union officials that had the effect of increasing the cost to the Government of goods and commodities it purchased and the supplying of inferior quality.

"In the passage of the Taft-Hartley law in 1947 [29 U.S.C.A. § 141 et seq.], the Congress undertook to protect union members, the general public, and the Government against certain types of racketeering, including the misuse of misappropriation of union funds by dishonest union officials. The law provides that there shall be a registration of labor organizations and a full and accurate report by such organizations of their revenues and expenditures and of all compensation and allowances over and above $5,000 paid to and received by labor union officials and union employees from dues collected from members or from other union funds.

\* \* \* \* \* \*

"The subcommittee is aware of recent court decisions which may sharply limit and restrict the right of Government agencies such as the Treasury Department, the Bureau of Internal Revenue, the Department of Labor, and the National Labor Relations Board to investigate and determine the accuracy, truthfulness or falseness of various reports the unions and their officials are obligated to file.

\* \* \* \* \* \*

" * * * We also want to know whether and why such tax exempt

labor union organizations can refuse to allow either the legislative or the executive branch of the Government to examine their books and records. * * *

"This subcommittee proposes to determine whether, after such refusal, the continuance of a tax exempt status is warranted or if such tax exempt status should be forfeited by such refusal."

"In the course of our previous investigations and this present preliminary inquiry, we have acquired information that clearly indicates that there is labor racketeering in the area of Government procurement resulting in increased cost to the taxpayers for commodities produced; that false reports have been filed by certain labor organizations with respect to their expenditures; that compensation and allowances paid by certain unions to their officials have not been accurately and truthfully reported; that there has been manipulation of accounts involving dues collected from their members, as well as welfare funds; also other irregularities and improprieties have come to the attention of the subcommittee."

In his conclusion, the Chairman affirms the subcommittee purpose to look into these matters and, if necessary, to recommend legislation or changes in administrative procedure to aid the above agencies in achieving their statutory goals efficiently and without waste. This, then, is the "question under inquiry": Whether the true state of union finances are reflected in the reports filed with the Government agencies and, if not, what may be done about it?

■ The constitutional power of Congress to inquire into this area is not in question here. "The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes." Watkins v. United States, supra, 77 S.Ct. at page 1179.

## I

■ The fundamental question then arises: Did this inquiry fall within the authority delegated by the Congress to the parent Committee on Government Operations and thence to the Permanent Subcommittee on Investigations? This Court finds that it did.

The Legislative Reorganization Act of 1946 (Public Law 601, 79th Congress, 2d Sess., 60 Stat. 812(1946) was designed to streamline the committee system of the Senate by reducing the number of standing committees from thirty-three to fifteen, to correspond with major areas of public policy and administration. See Senate Report No. 1400, 79th Congress, 2d Sess. (1946). The statute amended Rule XXV of the Standing Rules of the Senate which sets forth the powers and duties of the Standing Committees. Rule XXV(1) (g) provides as follows:

"(g) (1) Committee on Government Operations, to consist of thirteen Senators, to which committee shall be referred all proposed legislation, messages, petitions, memorials, and other matters relating to the following subjects:

"(A) Budget and accounting measures, other than appropriations.

"(B) Reorganizations in the executive branch of the Government.

"(2) Such committee shall have the duty of—

"(A) receiving and examining reports of the Comptroller General of the United States and of submitting such recommendations to the Senate as it deems necessary or desirable in connection with the subject matter of such reports;

"(B) *studying the operation of Government activities at all levels with a view to determining its economy and efficiency;*

"(C) *evaluating the effects of laws enacted to reorganize the legislative and executive branches of the Government;*

"(D) studying intergovernmental relationships between the United States and the States and municipalities, and between the United States and international organizations of which the United States is a member." (Italics supplied.)

The italicized sections are those principally relied upon by the Government in this case. These provisions constitute the "controlling charter" of committee authority and circumscribe its proper activities. United States v. Rumely, 1952, 345 U.S. 41, 44, 73 S.Ct. 543, 97 L.Ed. 770. As was customary, the full investigative power of the parent committee for the year 1957 was invested in the Permanent Subcommittee on Investigations. The official minutes of the meeting of January 14, 1957, of the Committee on Government Operations provide:

"It was reaffirmed that the Senate Permanent Subcommittee on Investigations is authorized to continue to conduct such investigation as its parent Committee, the Committee on Government Operations, is empowered to conduct under the Legislative Reorganization Act of 1946."

To begin with, it seems evident that the truthfulness of the statements filed with the Department of Labor has a great deal to do with the efficiency and economy of the National Labor Relations Board. Under the Labor-Management Relations Act (1947), 29 U.S.C.A. § 141 ff., 61 Stat. 136 (1947), popularly known as the Taft-Hartley Act, the Board is given broad investigatory and enforcement powers over both labor and management in order to reduce industrial strife by preventing unfair practices by either party. *It is important to note that the Board is authorized to extend its valuable aid only to those labor organizations that file ,with the Secretary of Labor, among other things, a financial statement containing the following information:*

"(1) * * * all of (a) its receipts of any kind and the sources of such receipts, (b) its total assets and liabilities as of the end of its last fiscal year, (c) the disbursements made by it during such fiscal year, *including the purposes for which made;* and

"(2) furnished to *all of the members* of such labor organization copies of the financial report required by paragraph (1) of this subdivision to be filed with the Secretary of Labor." 29 U.S.C.A. § 159 (f) (Emphasis supplied).

The scope of this provision shows Congressional concern with the financial integrity of every labor organization that avails itself of the aid of the Labor Board. Nothing less than accurate and truthful disclosure would serve that purpose. The services of the Board are not inexpensive; they could not have been intended for undeserving organizations. As the subcommittee Chairman remarked above, recent court decisions tend to cast doubt on the ability of agencies to check into financial statements filed by unions. Add this to the evidence of alleged false reports and evidence of further manipulation by union officials filing with the Labor Department, and the practical effectiveness of the Labor Board is seriously called into question. This matter compellingly falls within the range of "economy and efficiency" in this Government agency. As was recently held with respect to this subcommittee's inquiry into the U. S. Information Agency:

"That this Committee had the power to consider more than budgeting and fiscal matters of government operation is conclusively demonstrated by both the statute setting it up and the legislative history cited. In addition, the Act imposes the duty of studying 'efficiency of government activities at all levels' upon the Committee. In examining the efficiency of its programs, Congress can do more than look for waste; it must be able to examine the efficiency of any program in its entirety, to see if it is carrying out the purposes for which it was created, as part of the study of economic

efficiency. A program not carrying out its objective can hardly be said to be economically efficient." United States v. O'Connor, D.C.D.C.1955, 135 F.Supp. 590, 595, reversed on other grounds, 1956, 99 U.S.App. D.C. 373, 240 F.2d 404.

The subcommittee also has a wide responsibility to assess the effects of laws reorganizing the executive department. It is possible that administrative revisions and procedural changes will enable the Labor Board to render greater service to sound labor-management relations. All of these matters were encompassed in the subject matter under inquiry on January 19, 1957, and all of them were fairly authorized by Standing Rule XXV (1) (g), the Charter of the Committee on Government Operations.

As a matter of recent history it is important to note the wide compass of the subcommittee's activity. During 1956, for instance, the subcommittee looked into such varied topics as Communist infiltration in defense plants, textile procurement in the military services, tariffs on imported watches, redefections among Iron Curtain refugees, strategic trade between East and West, purchase of locomotives by the Spanish Government and the release of American prisoners in Iron Curtain countries. (Annual Report, Sen.Rep. 1444, 84th Congress, 2d Sess. (1957) ). Year after year, the Senate impliedly approves these projects by renewing and often increasing appropriations. The investigative staff of this committee is one of the largest of the Senate. All these factors taken together tend to show the dominant role played by the Permanent Subcommittee on Investigations in the exercise of the Senate's investigating powers.

As a result of these considerations, this Court finds, beyond any doubt, that the subcommittee had the authority to conduct this inquiry.

## II

■ Defendant next contends that the questions contained in the indictment were not pertinent to the subject under inquiry. It is well settled that a Congressional committee may ask nonpertinent questions, but when the Government seeks to convict a witness criminally for refusing to answer a given question, then pertinency must be established as an element of the offense. Sinclair v. U. S., 1929, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692; Bowers v. U. S., 1953, 92 U.S.App.D.C. 79, 202 F.2d 447. Before the issue of pertinency can be settled, it must be established that the subject matter was within the constitutional power of Congress to legislate, and that it is encompassed by the grant of authority to the particular committee. United States v. Orman, 3 Cir., 1953, 207 F.2d 148, 153. Both of these requirements have been found by the Court to have existed in this case. Like the issue of materiality in perjury cases and the problem of relevancy of evidence, the question of "pertinency" is properly to be decided by the Court as a matter of law. Sinclair v. U. S., supra, 279 U.S. at page 298, 49 S.Ct. at page 273. But pertinency is a much broader test than that of relevancy. Whereas the evidence adduced at trial must pertain to the issues of a particular case, a legislative inquiry must anticipate all possible cases which might reasonably be the subject of legislative action. United States v. Orman, supra; Townsend v. U. S., 1938, 68 App.D.C. 223, 95 F.2d 352, certiorari denied 1938, 303 U.S. 664, 58 S. Ct. 830, 82 L.Ed. 1121.

■ This Court finds that the pertinency of the questions contained in the indictment has been established. One of the principal issues under inquiry was the adequacy and accuracy of the reports required to be filed by union organizations. Seven questions sought to elicit the actual purpose for which union funds were being used; eleven dealt with the effort to have the defendant identify and verify certain of the forms already filed by Joint Council 28 with the Department of Labor. These questions clearly relate to the vital problem the committee sought to solve; namely, is

it a sound operating practice to grant the services of the Labor Board to union organizations whose reports may be false and whose funds may be misappropriated?

 Seven other questions were calculated to reveal the intent of the witness in refusing to answer, and to find out whether he would give the desired information to any body of Congress. Before citing a witness for contempt, an investigating committee ought to ascertain the nature of his objection. Quinn v. United States, 1955, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964. The subcommittee here was seeking to assure itself of the contumacious attitude of the defendant before taking further action. It was up to the defendant to define the extent of his objection, and he refused to cooperate.

The telegram dealing with the invocation of constitutional privileges by Teamster officials was also queried. Several inferences could have been drawn from this telegram. It may have indicated either an effort to hinder the subcommittee's probe or a consciousness of guilt, or, at best, a less than frank approach to the duties of union officers under the Taft-Hartley Act. Defendant ranked high and could have enlightened the committee members. He declined to do so.

 He also declined at the outset to tell the subcommittee his occupation and suggested they find out from his prepared statement. The Chairman indicated that the statement had not been properly submitted 24 hours in advance as required by Rule 8 of the Subcommittee's Rules of Procedure (Government Exhibit 12). Even though a committee of Congress may be aware of a fact, a witness has no right to set his own conditions for testifying or to force the committee to depart from its settled procedures. Eisler v. United States, 1948, 83 U.S.App.D.C. 315, 170 F.2d 273, appeal dismissed 1949, 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542; United States v. Orman, supra. Self-identification by the witness has a bearing on whether, as a union officer, he obeys federal regulations. The Court therefore finds that this question and all the questions contained in the indictment were pertinent as a matter of law to the subject under inquiry.

### III

With respect to the subpoenas duces tecum, the defendant maintains that they are so broad, sweeping and lacking in particularity as to constitute an unreasonable search and seizure under the Fourth Amendment. Subpoena No. 3632 was addressed to "Frank Brewster, Western Conference of Teamsters" and subpeona No. 3633 was headed: "To: Frank Brewster, Joint Council No. 28, International Brotherhood of Teamsters, etc." The provisions of the subpoenas are substantially the same and read, in part, as follows:

"* * * produce the books and records of (each organization) for the period from January 1, 1951 to December 31, 1955, including cash receipts and disbursements, canceled checks, general ledgers, bills and invoices, bank statements, check stubs, correspondence files memoranda, and minutes of meetings." (Government Exhibit 6, page 38.)

 It has been pointed out that neither an incorporated or an unincorporated association can assert an unqualified right to conduct its affairs in secret. United States v. Morton Salt Co., 1950, 338 U.S. 632, 636, 70 S.Ct. 357, 94 L.Ed. 401. However, a corporation may challenge an order for the production of records if it is unreasonable on grounds other than self-incrimination, i. e., if it is too sweeping, Hale v. Henkel, 1906, 201 U.S. 43, 76, 26 S.Ct. 370, 50 L.Ed. 652; if the information sought is not relevant to any lawful inquiry, Oklahoma Press Pub. Co. v. Walling, 1946, 327 U.S. 186, 208, 66 S.Ct. 494, 90 L. Ed. 614, or if it represents "a fishing expedition" in quest of evidence of crime, Federal Trade Commission v. American Tobacco Co., 1924, 264 U.S. 298, 305–306, 44 S.Ct. 336, 68 L.Ed. 696. However, Mr. Justice Rutledge, in the Okla-

homa Press case, supra, states the law that governs here. In that case, the issues concerned the right of the Administrator to obtain judicial enforcement of subpoenas duces tecum issued by him in the course of investigations under § 11(a) of the Fair Labor Standards Act [52 Stat. 1060 (1938), 29 U.S.C.A. § 211(a)]. The subpoena called for the production of:

"All of your books, papers and documents showing the hours worked by and wages paid to each of your employees between October 28, 1938, and the date hereof, including all payroll ledgers, time sheets, time cards and time clock records and all your books, papers and documents showing the distribution of papers outside the State of Oklahoma, the source and receipt of news from outside the State of Oklahoma, and the source and receipt of advertisements of nationally advertised goods." Id., 327 U.S. 210, 66 S.Ct. 506, at footnote 46.

The administrator was trying to find out whether the corporation was subject to the Fair Labor Standards Act and, if so, whether it was violating the Act. The corporation argued that the above subpoena was so lacking in particularity as to violate the Fourth Amendment. In rejecting this contention, the Court held that the description in the subpoena was made with all of the particularity the nature of the inquiry and the Administrator's situation would permit.

" * * * the requirement of reasonableness, including particularity in 'describing the place to be searched, and the persons or things to be seized,' also literally applicable to warrants, comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily, as has been said, this cannot be reduced to formula; for relevancy and adequacy. or excess in the breadth of the subpoena are matters variable in relation to the *nature, purposes and scope of the inquiry.*" Id., 327 U.S. at page 209, 66 S.Ct. at page 506. (Emphasis supplied.)

After applying these principles to this controversy, the Court finds no supportable challenge to the constitutional validity of these subpoenas. Their terms are only as broad as the scope of the inquiry. If subpoenas like these are to fail, the unions will be cloaked with absolute immunity and Congress must wait in the darkness until suspected union officers get around to volunteering confirmatory data.

Defendant places much reliance on Local 174, International Brotherhood of Teamsters, etc. v. United States, 9 Cir., 1956, 240 F.2d 387. In that case, Internal Revenue agents were investigating the income tax liability of defendant. It was held, despite a strong dissent, that the court below could not issue an order to produce financial records of the local union unless the order was limited to documents pertinent to the tax affairs of the Brewsters. But there the tax liability of defendant was the sole measure of "reasonableness". The Permanent Subcommittee on Investigations, however, was primarily concerned with the union reports filed with the Government. Interest in individuals was purely ancillary. The Court concludes, therefore, that the above subpoenas were reasonably coextensive with the proper scope of subcommittee inquiry, and did not infringe Fourth Amendment privileges.

## IV

Defendant also proffered evidence to prove that, even if he had been in contempt before the subcommittee, he had nevertheless "purged" himself by testifying freely before the Select Committee to Investigate Improper Activities in the Labor-Management Field, and by opening the union files to Congressional scrutiny. At that point, the Court excluded further evidence on this issue. The Court finds, as a matter of law, that the defense of purging cannot apply in this action.

In the first place, the evidence shows that defendant never went before the Subcommittee on Investigations to remove the obstruction set up to *their* inquiry. On the contrary, defendant's contumacy was probably one of the reasons why this Subcommittee's work ground to a stop and that an entirely new body had to be put together with greatly enlarged jurisdiction and resources.

 Secondly, it appears to be defendant's position that as long as the Senate got the information it wanted, it matters little through which committee it was obtained. Assuming without deciding that this is sound, nevertheless, it is well settled, in the Federal Courts at least, that while purgation by compliance relieves from a "civil" contempt, it is no longer a defense to a "criminal" contempt charge.

 Defendant appears to characterize contempt of Congress as a "civil" contempt, where the order is "coercive" and where a recalcitrant is held in confinement until he decides to obey. But it is evident from the procedures set up by the Congress for the prosecution of those who refuse to produce evidence before its committees that the contempt is "criminal" in nature. Of course, no black and white test is possible. Gompers v. Buck's Stove and Range Co., 1911, 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797. But, if the tests laid down in the Gompers case are applied here, the distinguishing attributes of criminal contempt are unmistakably revealed. Under Title 2, Section 192, a wilful intent is required. A substantial fine or imprisonment may be imposed for a definite duration or amount. There is no provision for release upon obedience. Section 194 provides that whenever section 192 has been violated, and the fact is reported to either House, it shall be the duty of the President of the Senate or the Speaker of the House to certify the facts to the appropriate United States Attorney, whose duty it shall be to bring the matter before the grand jury for its action. 2 U.S.C.A. § 194, 49 Stat. 2041 (1936). Finally, the cause is brought under an indictment in the name of the United States and is subject to the right of trial by jury. The aim of a civil contempt, by contrast, is remedial and usually for the benefit of some particular complainant. The imprisoned parties "carry the keys of their prison in their own pockets". In re Nevitt, 8 Cir., 1902, 117 F. 448, 461. None of these characteristics are present here. Obviously, then, we are dealing with a criminal contempt.

It is settled, in the Federal Courts at least, that the defense of purging in criminal contempt has been abolished. At common law, where a person was held for an act of defiance against the Court, he could take an oath denying any purpose to obstruct the Court and conclusively "purge" himself. Cf. 12 Am.Jur., Contempt, § 73 (1938). However, since the landmark decision of Clark v. United States, 1932, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993, this defense is no longer valid. In the Clark case, the petitioner was a juror who had concealed her former job with the defendant when questioned on voir dire. Because of her lone vote for acquittal, the jury had to be discharged as unable to agree. It was argued that she had purged herself of contempt by denying on the stand any intent to obstruct the Court. On this point, the Court ruled, 289 U.S. at page 19, 53 S.Ct. at page 471:

> "The oath of a contemnor is no longer a bar to a prosecution for contempt. Little was left of that defense after the decision of this court in United States v. Shipp, 203 U.S. 563, 574, 27 S.Ct. 165, 51 L.Ed. 319, [324], 8 Ann.Cas. 265. Since then there has been no purgation by oath where an overt act of defiance is the gist of the offense. * * *
>
> "The time has come, we think, to renounce the doctrine altogether and stamp out its dying embers. * * * It has even lost, since the decision in the Shipp case, the title to respect that comes of a long historical succession. It has taken its place with ordeal and wager of law

and trial by battle among the dimly remembered curios of outworn modes of trial."

This Court, therefore, is entirely foreclosed from considering the defense of purging.

Nor was there any evidence that the Senate considered defendant otherwise than in contempt. Defendant was cited by that body and that citation was never withdrawn. The decision in Jurney v. MacCracken, 1935, 294 U.S. 125, 55 S.Ct. 375, 79 L.Ed. 802, is not to the contrary. In holding that the Senate had jurisdiction to try for contempt as against a writ of habeas corpus despite allegations that petitioner had removed all obstructions, Mr. Justice Brandeis said for the court in 294 U.S. on page 152, 55 S.Ct. at page 380:

"Whether he is guilty, and whether he has so far purged himself of contempt that he does not now deserve punishment, are the questions which the Senate proposes to try."

It is not to be lightly inferred from this, that merely because the Court is now trying the issue of guilt, that it is also free to conclude on its own that conduct, which the Senate branded as an obstruction when it cited defendant, is not really an obstruction after all. The doctrine of Separation of Powers leads to a contrary conclusion. Sanction for such a judicial invasion of legislative discretion should not be wrenched from dicta based on different facts.

### V

Repeatedly throughout the trial, defendant has ascribed ulterior motives to the subcommittee. He maintains that the only aim of the inquiry of January 19 was to delve into private union affairs in order to rake up and publicize alleged racketeering by union officers. The Government adduced evidence to show subcommittee concern with the effectiveness of current procedures with respect to reports filed with the Department of Labor. Defendant has characterized this in the language of Watkins as "retroactive rationalization" of what was to the committee a mere "after-

thought". The Court cannot agree with this.

As Chief Justice Warren wrote in the Watkins opinion:

"Petitioner has earnestly suggested that the difficult questions of protecting these rights from infringement by legislative inquiries can be surmounted in this case because there was no public purpose served in his interrogation. His conclusion is based upon the thesis that the Subcommittee was engaged in a program of exposure for the sake of exposure. The sole purpose of the inquiry, he contends, was to bring down upon himself and others the violence of public reaction because of their past beliefs, expressions and associations. In support of this argument, petitioner has marshalled an impressive array of evidence that some Congressmen have believed that such was their duty or part of it.

"We have no doubt that there is no congressional power to expose for the sake of exposure. * * * But a solution to our problem is not to be found in testing the motives of committee members for this purpose. Such is not our function. *Their motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served.*" (Emphasis supplied.) 77 S.Ct. 1173, 1185.

For the reasons set forth above, the Court has found that the subcommittee was acting within the range of its authority and was seeking facts in an area appropriate for legislative action. Once this is established, issues of motivation fade away.

### VI

The Government's only witness in this trial was the Chief Counsel of the Permanent Subcommittee on Investigations. His testimony, among other things, tended to reveal the background leading up to the hearings in question, and threw much light on the scope of

the inquiry and the pertinency of the questions in the indictment. Defendant several times objected that this testimony was incompetent as to the purpose of the committee, and that it consisted largely of hearsay and opinions. However, the Court finds these objections groundless. Great latitude was granted to both sides so that the Court could resolve the factual and legal issues set up by the indictment. As Judge Burger asserted in Sacher v. United States, 1957, 99 U.S.App.D.C. 360, 240 F.2d 46, at page 52:

"Third, it is urged that the testimony of the Subcommittee's legal counsel was inadmissible in the district court. * * * Considerable latitude must be allowed to establish the background and basis for a given line of congressional inquiry. * * * Furthermore, in a contempt proceeding, when the questions asked may not be pertinent on their face to the inquiry, it is the Government's duty to establish by other evidence this relationship."

Since these issues had to be resolved and since the Chief Counsel has an intimate knowledge of subcommittee investigations, his testimony may not be ruled out by carping technicalities.

### Conclusion

At the close of all the evidence, defendant renewed his earlier motion for a judgment of acquittal on all the counts of the indictment and moved again to dismiss. At this time, the Court denies both of these motions based on the reasons set forth above.

It is the judgment of this Court that the defendant is guilty on each and every count of the indictment.

Pursuant to Rule 32, Federal Rules of Criminal Procedure, 18 U.S.C.A., the Court refers all cases after conviction to the Probation Office for a pre-sentence report and investigation, and that will be done in this case. The defendant's present bond will continue in effect pending receipt of this report.