DEUTCH *v.* UNITED STATES.

No. 233.   Argued March 22–23, 1961.—Decided June 12, 1961.

*Henry W. Sawyer III* argued the cause for petitioner. With him on the brief was *George Herbert Goodrich.*

*Kevin T. Maroney* argued the cause for the United States. With him on the briefs were former *Solicitor General Rankin, Solicitor General Cox, Assistant Attorney General Yeagley* and *Bruce J. Terris.*

MR. JUSTICE STEWART delivered the opinion of the Court.

Once again we are called upon to review a criminal conviction for refusal to answer questions before a subcommittee of the Committee on Un-American Activities of the House of Representatives.[1] See *Quinn* v. *United States,* 349 U. S. 155; *Emspak* v. *United States,* 349 U. S. 190; *Watkins* v. *United States,* 354 U. S. 178; *Barenblatt* v. *United States,* 360 U. S. 109; *Wilkinson* v., *United States,* 365 U. S. 399; *Braden* v. *United States,* 365 U. S. 431. The petitioner was brought to trial in the District Court for the District of Columbia upon an indictment which charged that he had violated 2 U. S. C. § 192 by refusing to answer five questions "which were pertinent to the question then under inquiry" by the subcommittee. He waived a jury and was convicted upon four of the five counts of the indictment. The judgment was affirmed by the Court of Appeals, 108 U. S. App. D. C. 143, 280 F. 2d 691, and we brought the case here because of doubt as to the validity of the conviction in the light of our pre-

---

[1] "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months." 2 U. S. C. § 192.

vious decisions.[2]   364 U. S. 812.   A careful review of the trial record convinces us that the District Court should have ordered an acquittal.

At the trial the Government's case consisted largely of documentary evidence.  That evidence showed that a subcommittee of the House Committee on Un-American Activities conducted hearings in Albany, New York, in July of 1953, and again in early April of 1954.  The petitioner was not present on either occasion.  He was subpoenaed to appear before the subcommittee in Albany on April 9, 1954, but, at the request of his counsel, it was agreed that he should appear instead before the subcommittee three days later in the Old House Office Building in Washington, D. C.

He appeared there on the appointed day, accompanied by counsel, and without further ado his interrogation began.  The petitioner freely answered all preliminary questions, revealing that he was then twenty-four years old and a graduate student at the University of Pennsylvania. He stated that his early education had been in the public schools of Brooklyn, New York, from where he had gone to Cornell University in 1947 for four years as an undergraduate and two additional years as a graduate student.

The subcommittee's counsel then made the following statement:

> "Mr. Deutch, during hearings at Albany last week, the committee heard testimony regarding the existence of a Communist Party group or cell operating among undergraduates at Cornell University, among certain graduates at Cornell and in the city of Ithaca.

---

[2] See, in addition to the cases cited in the text, *supra: Sinclair* v. *United States,* 279 U. S. 263; *United States* v. *Bryan,* 339 U. S. 323; *United States* v. *Fleischman,* 339 U. S. 349; *United States* v. *Rumely,* 345 U. S. 41; *Sacher* v. *United States,* 356 U. S. 576; *Flaxer* v. *United States,* 358 U. S. 147.  See also *McPhaul* v. *United States,* 364 U. S. 372.

"In connection with that testimony, the committee was informed that you were a member of one or more of those groups. If so, I would like to ask you certain matters relating to your activity there.

"Were you a member of a group of the Communist Party at Cornell?"

The petitioner answered, "under protest," that he had indeed been a member of the Communist Party while at Cornell.[3]   He then testified freely and without further objection as to his own activities and associations.  He stated that "from the age of 13 or 14 I had read many books on Marxism and at that time was very much impressed with trying to solve certain of the injustices we have nowadays."  He said that when he got to college "I felt if I had ideas I shouldn't be half pregnant about them, so when I came to college I was approached and joined." He stated that the approach to join the Party had been made by a student.

As to the general nature of his Communist Party activities at Cornell, he said "about all that happened were bull sessions on Marxism, and some activities like giving out a leaflet or two.  The people I met didn't advocate the overthrowing of the Government by force and violence, and if they had, I wouldn't have allowed it."  He testified that he had known one faculty member at Cornell who was a Communist, but that this person had quit the Party.  He stated that he had once received from "a personal friend," who was not connected with the Cornell faculty, a $100 contribution to give to the Party.  He

---

[3] "I will answer that question, but only under protest.

"I wish to register a challenge as to the jurisdiction of this committee under Public Law 601, which is the committee's enabling legislation.  This question, or any similar questions involving my associations, past or future, I am answering, but only under protest as to its constitutionality.  But, under your jurisdiction as stated, I answer yes, I was a member of the Communist Party."

stated that he had been the only graduate student at Cornell who was a Communist, and that, as the "head" (and lone member) of the "graduate group," he had attended meetings in a private house where a "maximum of 4 or 5" people were present. Many of his answers indicated a lack of awareness of the details of Communist activities at Cornell.[4] The petitioner testified that as of the time of the hearings he was no longer a member of the Communist Party, but he volunteered the information that "[t]o a great extent it is only fair to say I am a Marxist today—I don't want to deny that."

While the petitioner's answers to the many questions put to him about his own activities and conduct were thus

[4] The following colloquies are typical:

"Mr. Doyle: Who published the leaflets?

"Mr. Deutch: I believe the Communist Party published them.

"Mr. Doyle: What Communist Party? Where did you get the leaflets? From the national headquarters?

"Mr. Deutch: I don't believe so. It was a local branch.

"Mr. Doyle: Where was the office of the local branch from which you got these leaflets?

"Mr. Deutch: I didn't know where it was. I was just asked to distribute them."

.          .          .          .          .

"Mr. Tavenner: Were you ever a member of the Downtown Club of the Communist Party in Ithaca?

"Mr. Deutch: I don't believe so.

"Mr. Tavenner: Did you attend meetings of that group?

"Mr. Deutch: No. That is, I don't believe so. The reason I wonder is because that organization became defunct so that there was really no organization. Downtown was Uptown, and there were so few people that I just want to qualify that statement."

.          .          .          .          .

"Mr. Scherer: Let me ask you this question. You knew where the meetings were held?

"Mr. Deutch: I don't believe I know exactly where they were. This is because—since Mr. Richardson drove me there." [Mr. Richardson was a law student at Cornell who had joined the Communist Party at the behest of the Federal Bureau of Investigation. See p. 466, *infra*.]

fully responsive, he refused to answer five questions he was asked concerning other people. He declined to give the names of the faculty member who had been a Communist, of the friend who had made the $100 contribution, of the student who had originally approached him about joining the Communist Party, and of the owners of the house where the meetings had been held. He also declined to say whether he was acquainted with one Homer Owen. For his refusal to answer these questions he was indicted, tried, and convicted.[5]

The reason which the petitioner gave the subcommittee for his refusal to answer these questions can best be put in his own words:

> "Sir, I am perfectly willing to tell about my own activities, but do you feel I should trade my moral scruples by informing on someone else? . . . I can only say that whereas I do not want to be in

---

[5] The questions, as set out in the five counts of the indictment, were as follows:

"Count One

"The committee was advised that a witness by the name of Ross Richardson has stated that you acted as liaison between a Communist Party group on the campus and a member of the faculty at Cornell, and that you knew the name of the member of that faculty, who was a member of the Communist Party. Will you tell us who that member of the faculty was?

"Count Two

"Will you tell the committee, please, the source of that $100 contribution, if it was made?

"Count Three

"Where were these meetings held?

"Count Four

"Were you acquainted with Homer Owen?

"Count Five

"The witness is directed to give the name of the person by whom he was approached."

The petitioner was convicted on all but Count Three.

contempt of the committee, I do not believe I can answer questions about other people, but only about myself. . . . I happen to have been a graduate student—the only one there, and the organization is completely defunct, and the individual you are interested in wasn't even a professor. The magnitude of this is really beyond reason."

The chairman of the subcommittee ruled that it was the petitioner's duty nevertheless to answer the questions:

"That decision does not rest with you as to whether or not the scope of this inquiry—as to whether or not certain individuals are important now or not. That is the responsibility of we Representatives to determine. That determination cannot rest with you. It may be very true that the individual to whom you have referred is no longer a member of the Communist Party. However, that is a supposition on your part—and a supposition which the committee cannot accept. . . . I think that it is only fair to advise the witness—again advise the witness—that any scruples he may have due to a desire to protect friends and acquaintances, is not a legal reason for declining to answer the questions which are now being put to you, and which will be put to you by counsel."

In an effort to prove the pertinence of the questions which the petitioner had refused to answer, the Government offered at the trial the transcripts of the opening statements of Subcommittee Chairman Kearney at the Albany hearings in 1953 and 1954 and of Subcommittee Chairman Velde at a hearing in Chicago in 1954, as well as an additional portion of the transcript of the 1954 Albany hearing. One witness, the counsel for the Committee on Un-American Activities, testified. A review

of this evidence convinces us that the Government failed to prove the charge in the indictment that the questions which the petitioner refused to answer were "pertinent to the question then under inquiry" by the subcommittee before which he appeared.

The Chairman's opening statement at the Albany hearing in 1953 consisted largely of a paraphrase of the Committee's authorizing resolution and a general summary of the Committee's past activities.[6] The only statement of a specific purpose was as follows:

"The committee, in its course of investigation, came into possession of reliable information indicat-

---

[6] "The committee is charged by the Congress of the United States with the responsibility of investigating the extent, character and objects of un-American propaganda activities in the United States, the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries, or of a domestic origin, and attacks the principles of the form of government as guaranteed by our Constitution and all other questions in relation thereto that will aid Congress in any necessary remedial legislation.

"It has been fully established by testimony before this and other congressional committees and before the courts of our land that the Communist Party of the United States is part of an international conspiracy, which is being used as a tool or a weapon by a foreign power to promote its own foreign policy and which has for its objective the overthrow of the governments of all non-Communist countries, resorting to the use of force and violence if necessary. This organization cannot live and expand within the United States except by the promulgation and diffusion of subversive and un-American propaganda designed to win adherence to its cause. .

"The first witness in this hearing will testify regarding certain aspects of the worldwide Communist conspiracy, which should demonstrate what a serious matter it is to permit individuals who are subject to the directives and discipline of the Communist Party to be placed in positions of leadership in any functional organization.

"The committee, in its course of investigation, came into possession of reliable information indicating Communist Party activities within the Albany area. The committee decided that this information was

ing Communist Party activities within the Albany area. The committee decided that this information was of such a character as to merit an investigation to determine its nature, extent, character, and objects."

---

of such a character as to merit an investigation to determine its nature, extent, character, and objects.

"Many witnesses have appeared before this committee, sitting in various places throughout the United States, and have revealed their experiences as former Communist Party members. Such testimony has added immeasurably to the sum total of the knowledge, character, extent, and objects of Communist activities in this country.

"Witnesses from Hollywood, labor unions, the legal profession, medical profession, and other groups have made a great contribution to the defense of our country by disclosing to this committee facts within their knowledge.

"In the view of this committee, such testimony should not be held against an individual where it has that character of trustworthiness which convinces one that the witness has completely and finally terminated Communist Party membership and that such testimony has been given in all good faith.

"The committee is not concerned with the political beliefs or opinions of any witness who has been called before it. It is concerned only with the facts showing the extent, character, and objects of the Communist Party activities.

"In keeping with the long-standing policy of this committee, any individual or organization whose name is mentioned during the course of the hearings in such a manner as to adversely affect them shall have an opportunity to appear before the committee for the purpose of making a denial or explanation of any adverse references.

"I would also like at this time, before the beginning of these hearings, to make this announcement to the public: We are here at the discretion of the Congress of the United States, trying to discharge a duty and obligation that has been placed upon us. The public is here by permission of the committee and not by any compulsion. Any attempt or effort on the part of anyone to make a demonstration or audible comment in this hearing room, either favorably or unfavorably, toward the committee's undertaking, or to what any witness may have to say, will not be countenanced by the committee. If such conduct should occur, the officers on duty will be requested to eject the offenders from the hearing room."

At the opening of the Albany hearings in 1954 the Chairman stated that the subcommittee would "resume this morning the investigation of Communist Party activities within the capital area." He made clear that the hearings were "a continuation of the open hearings which were conducted in Albany" in 1953. He pointed out that testimony at the 1953 hearings had "related to the efforts of the Communist Party to infiltrate industry and other segments of society in the capital area." "This committee," he said, ". . . is investigating communism within the field of labor where it has substantial evidence that it exists."

The opening statement of the Chairman of the subcommittee which held hearings in Chicago in 1954 is the same statement that was before this Court in *Watkins* v. *United States,* 354 U. S. 178, 210. As was pointed out in the *Watkins* opinion, Mr. Velde "did no more than paraphrase the authorizing resolution and give a very general sketch of the past efforts of the Committee." [7] Moreover, the statement indicated that that subcommittee hearing was directed primarily towards investigation of activities in the Chicago area: "We are here in Chicago, Ill., realizing that this is the center of the great midwestern area of the United States. It cannot be said that subversive infiltration has had a greater, nor a lesser success in infiltrating this important area. The hearings today are the culmination of an investigation that has been conducted by the committee's competent staff and is a part of the committee's intention for holding hearings in various parts of the country."

The transcripts of part of the testimony of two witnesses at the 1954 Albany hearings, John Marqusee and Emmanuel Richardson, were also introduced at the petitioner's

---

[7] The entire statement of Mr. Velde is set out at 354 U. S, 210–211, n. 49.

trial. These transcripts showed that Marqusee's testimony had related primarily to Communist infiltration of a labor union in Schenectady for which he had worked during a summer vacation in 1948.[8]   At that time he had been a student in the New York State School of Industrial and Labor Relations, which, he had testified, was a part of Cornell University.   He had told the subcommittee that he had never had any contact with the Communist Party before taking the labor union job.   The transcripts showed that he had explained that he had taken the job in accordance with the school's requirement "that every student should put forth his efforts in securing a job during the summer, during the intervening summers of his 4-year program, 1 summer with a labor union, 1 with a management group, if possible, and 1 summer with a neutral agency, such as a mediation agency or arbitration service."   There was no mention of the Cornell Graduate School, nor of the petitioner, in the transcript of Marqusee's testimony.

The transcript of Richardson's testimony showed that he had testified that as a student at the Cornell Law School in 1950 he had joined the Communist Party at the request of the Federal Bureau of Investigation.   He had named several people he had known as Communists on the Cornell campus, including the petitioner and Homer Owen.   He had stated that the petitioner had known a member of the Cornell faculty who was a Communist Party member, and that he had once received through the petitioner a contribution to the Party from someone else of "one hundred and some dollars."   The transcript showed that Richardson had also testified at length concerning Communist infiltration into a labor union in a plant in Syracuse where he had worked during the summers of 1951 and 1952.

---

[8] Schenectady is sixteen miles from Albany.

After these transcripts had been introduced at the petitioner's trial, the Government called its only witness, Frank S. Tavenner, Jr., who had been the "interrogating attorney" at the Albany hearings and at the petitioner's hearing before the subcommittee in Washington.[9] Mr. Tavenner emphasized that the hearing in Washington was a continuation of the Albany hearings, which he characterized as "a general investigation of Communist Party activities in what was referred to as the 'Capital Area.' " Under interrogation of government counsel, the witness expressly disclaimed that the purpose of the Washington hearing had been to investigate Communist activities in educational institutions.[10] He was asked what "connection was there between [the subject of the petitioner's testimony] and the investigations entitled 'Albany, New York'?" This question was never answered.

On this record the District Court found the subject under inquiry to be "the infiltration of Communism into educational and labor fields." 147 F. Supp., at 91. The Court of Appeals never stated what it thought the subject under inquiry by the subcommittee was.

As our cases make clear, two quite different issues regarding pertinency may be involved in a prosecution under 2 U. S. C. § 192. One issue reflects the requirement of the Due Process Clause of the Fifth Amendment that the pertinency of the interrogation to the topic under the

---

[9] The subcommittee before which the petitioner appeared, "for the purpose of taking this testimony this morning," consisted of Representative Jackson, Acting Chairman, and Representatives Scherer and Doyle. The subcommittee which had conducted the hearings at Albany a few days earlier was composed of Representative Kearney, Chairman, and Representatives Scherer and Walter.

[10] "Q. How does it happen that Mr. Deutch's testimony appears in 'Education—8' if it was a part actually of 'Albany'?

"A. Well, the staff in the releasing of this testimony at a later date placed it for convenience under the heading of Education."

congressional committee's inquiry must be brought home to the witness at the time the questions are put to him. "Unless the subject matter has been made to appear with undisputable clarity, it is the duty of the investigative body, upon objection of the witness on grounds of pertinency, to state for the record the subject under inquiry at that time and the manner in which the propounded questions are pertinent thereto." *Watkins* v. *United States,* 354 U. S., at 214–215. See *Barenblatt* v. *United States,* 360 U. S., at 123–124. The other and different pertinency issue stems from the prosecution's duty at the trial to prove that the questions propounded by the congressional committee were in fact "pertinent to the question under inquiry" by the committee. "Undeniably a conviction for contempt under 2 U. S. C. § 192 cannot stand unless the questions asked are pertinent to the subject matter of the investigation." *Barenblatt, supra,* at 123. "[T]he statute defines the crime as refusal to answer 'any question pertinent to the question under inquiry.' Part of the standard of criminality, therefore, is the pertinency of the questions propounded to the witness." *Watkins, supra,* at 208. See *Wilkinson* v. *United States,* 365 U. S., at 407–409, 413; *Braden* v. *United States,* 365 U. S., at 433, 435–436; *Sacher* v. *United States,* 356 U. S. 576, 577; *Sinclair* v. *United States,* 279 U. S. 263, 296–297. These two basically different issues must not be blurred by treating them as a single question of "pertinency."

With regard to the first issue, it is evident that the petitioner was not made aware at the time he was questioned of the question then under inquiry nor of how the questions which were asked related to such a subject. The chairman made no opening statement, and the petitioner heard no other witnesses testify. The resolution creating the subcommittee revealed nothing. It was

merely a general resolution authorizing the creation of a subcommittee to act for the Committee. Committee counsel simply advised the petitioner that the committee had previously heard evidence regarding Communist activity at Cornell, and that he proposed to ask the petitioner "certain matters relating to your activity there." As to his own activity there the petitioner freely testified. When the petitioner declined to give the names of other people, no clear explanation of the topic under inquiry was forthcoming.

It is also evident, however, that the thoughts which the petitioner voiced in refusing to answer the questions about other people can hardly be considered as the equivalent of an objection upon the grounds of pertinency. Although he did indicate doubt as to the importance of the questions, the petitioner's main concern was clearly his own conscientious unwillingness to act as an informer. It can hardly be considered, therefore, that the objections which the petitioner made at the time were "adequate, within the meaning of what was said in *Watkins, supra,* at 214–215, to trigger what would have been the Subcommittee's reciprocal obligation had it been faced with a pertinency objection." *Barenblatt, supra,* at 124.

We need not pursue the matter, however, because, in any event, it is clear that the Government at the trial failed to carry its burden of proving the pertinence of the questions. See *Bowers* v. *United States,* 92 U. S. App. D. C. 79, 202 F. 2d 447, 452. The first step in proving that component of the offense was to show the subject of the subcommittee's inquiry. *Wilkinson* v. *United States,* 365 U. S., at 407. As related above, the Government offered documentary evidence of statements made by the chairman of the subcommittees at two hearings in Albany which tended to show that those subcommittees were investigating Communist infiltration in the Albany or

"capital" area, particularly in the field of labor.[11]   The Government presented one witness who testified that the petitioner's hearing was a continuation of the Albany hearings, and that the subject of those hearings was Communist infiltration in the Albany area.  He disavowed any implication that the topic under inquiry was Communism either at Cornell or in educational institutions generally.

Yet the questions which the petitioner was convicted of refusing to answer obviously had nothing to do with the Albany area or with Communist infiltration into labor unions.  It can hardly be seriously contended that Cornell University is in the Albany area.  Indeed, we may take judicial notice of the fact that Ithaca is more than one hundred and sixty-five miles from Albany, and in an entirely different economic and geographic area of New York.  The petitioner was asked nothing about Albany or the Albany area.  So far as the record shows, he knew nothing about that subject.  He was asked nothing about labor or labor unions.  So far as the record shows, he knew nothing about them.  He was asked nothing about any possible connection between Cornell or its graduate school and Communist infiltration in Albany.  Yet the petitioner was basically a cooperative witness, and there is nothing in the record to indicate that, except for giving the names of others, he would not have freely answered any inquiry the subcommittee wished to pursue with respect to these subjects.  It is true that the transcript of the testimony of two witnesses at the Albany hearings established that, in addition to testifying about Communist infiltration into labor unions in the Albany area, they had been willingly led into some testimony about Communist activities by the petitioner and others at Cor-

----

[11] We disregard the evidence indicating that the subject under inquiry was Communist activities in the Chicago area.

nell. But that excursion can hardly justify a disregard of the Government's careful proof at the petitioner's trial of what the subject under inquiry actually was. The pertinence of the interrogation of those two witnesses is not before us. The pertinence of the petitioner's interrogation is.

In enacting 2 U. S. C. § 192, the Congress invoked the aid of the federal judicial system to protect itself from contumacious conduct. *Watkins, supra,* at 207. "In fulfillment of their obligation under this statute, the courts must accord to the defendants every right which is guaranteed to defendants in all other criminal cases." *Id.,* at 208. "One of the rightful boasts of Western civilization is that the [prosecution] has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure." *Irvin* v. *Dowd,* 366 U. S. 717, 729 (concurring opinion). Among these is the presumption of the defendant's innocence. *Sinclair* v. *United States,* 279 U. S., at 296–297; *Flaxer* v. *United States,* 358 U. S., at 151. It was incumbent upon the prosecution in this case to prove that the petitioner had committed the offense for which he was indicted. One element of that offense was the pertinence to the subject matter under inquiry of the questions the petitioner refused to answer.[12] We hold, as a matter of law, that there was a failure of such proof in this case. *Sacher* v. *United States,* 356 U. S. 576; see *Sinclair* v. *United States,* 279 U. S., at 298–299; *Braden* v. *United States,* 365 U. S., at 436–437.

We do not decide today any question respecting the power or legislative purpose of this subcommittee of the House Un-American Activities Committee. Nor do we reach the large issues stirred by the petitioner's First

---

[12] This was hardly a matter within the peculiar knowledge of the petitioner. Cf. *McPhaul* v. *United States,* 364 U. S. 372, 379.

Amendment claims.   Our decision is made within the conventional framework of the federal criminal law, and in accord with its traditional concepts.   In a word, we hold only that the Government failed to prove its case.[13]

*Reversed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER joins, dissenting.

There is, of course, no doubt that a showing of "pertinency" is an essential part of the Government's burden in a prosecution under 2 U. S. C. § 192.   But the nature of this burden may differ, dependent upon what transpired at the Congressional inquiry giving rise to the prosecution.

In a case where the prosecution involves the defendant's refusal to answer a question whose pertinency was explained to him by the Congressional Committee before which he appeared as a witness—following his appropriate objection that the question was not pertinent to the matter "under inquiry," see *Barenblatt* v. *United States,* 360 U. S. 109, 123–124—the Government must stand or fall upon that explanation.   For it would be obviously unfair to allow the Government at trial to prove perti-

---

[13] For a Court opinion specifically to join issue with what is written in dissent is a practice ordinarily to be avoided.   One of the dissenting opinions in this case, however, is largely based upon what are asserted to be "the undisputed relevant facts in the record."   Since every litigant is entitled to have his case reviewed on the facts in the record, it is appropriate to state explicitly that:

(1) The record affirmatively shows that neither Marqusee nor Richardson testified, directly or indirectly, to "passing out handbills at strike scenes" or to any "plan of using the prestige and innocent aid of the university's placement service in getting summer jobs with labor unions in upper New York," or anywhere else.

(2) The record affirmatively shows that at no time did the subcommittee, or anyone on its behalf, "advise" the petitioner, or anyone else, that the subcommittee was investigating the infiltration of communism into the "educational and labor fields."

nency on a different theory than was given to the defendant at the time he testified, and on the basis of which he presumably determined that he need not answer the question put.

Where, however, the defendant made no "pertinency" objection as a witness before the Congressional Committee, the Government at trial is left free to satisfy the requirement of pertinency in any way it may choose. The present case is such a one, for, as the Court's opinion recognizes, the petitioner here made no adequate pertinency objection before the House Un-American Activities Subcommittee.

I dissent because in my opinion the Court's holding that the Government failed to establish "pertinency" rests on a too niggardly view of both the issue and the record. Pertinency, which in the context of an investigatory proceeding is of course a term of wider import than "relevancy" in the context of a trial, is to be judged not in terms of the immediate probative significance of a particular question to the matter under authorized inquiry, but in light of its tendency to elicit information which might be a useful link in the investigatory chain. See *Carroll* v. *United States,* 16 F. 2d 951, 953. An investigation must proceed "step by step." *Ibid.*

Pertinency is found lacking here because (1) inquiry as to affairs relating to petitioner's student days at Cornell University, situated at Ithaca, N. Y., it is said, was not germane to the Subcommittee's investigation as to Communist activities in "the Albany area"; and (2) in any event, such investigation, the Court finds, related only to alleged Communist infiltration into labor unions and not as well to infiltration "at Cornell or in educational institutions generally." I can agree with neither facet of this holding.

It is quite true, as the Court says, that Ithaca is some 165 miles away from Albany, but it seems to me much

too refined to say, as a matter of law, that the trial court could not reasonably determine that Ithaca was within the Subcommittee's terms of reference. Indeed, I think it fair to suggest that in common usage, at least among New Yorkers, "Albany area" would be regarded as aptly descriptive of "upstate" New York. In relation to "pertinency" the matter should not be judged as if it were one of technical jurisdiction or venue.

The other aspect of the Court's holding seems to me equally infirm. Accepting, as I shall, the Court's view that the trial record shows that the Subcommittee, at the relevant time, was investigating only alleged Communist "labor union," and not "educational," infiltration, it seems to me abundantly clear that the lower courts were justified in concluding that all of the questions with respect to which the petitioner was convicted * were pertinent to that matter.

Only shortly before it examined petitioner, the Subcommittee had interrogated two witnesses, Marqusee and Richardson, with respect to their Communist affiliations, their summer work with two labor unions in Schenectady and in Syracuse, and Communist infiltration into such unions, all while they were both students at Cornell. One of these witnesses, Richardson, had testified that during this period he had known the petitioner, and one Homer Owen (Count Four of the indictment), as Communists on the Cornell campus. I do not see why it should now be deemed either that the Subcommittee's interest in petitioner's testimony was confined to "educational infiltration," or that its preliminary questioning of him might not have led to developing information bearing on "labor union infiltration," possibly stemming from student Communist activity on the Cornell campus, had

---

* Counts One, Two, Four, and Five of the indictment, set forth in note 5 of the Court's opinion. *Ante,* p. 461.

further inquiry not been blocked by petitioner's refusal to answer.

I cannot agree that the decision of this case has been made "within the conventional framework of the federal criminal law." For surely in judging the pertinency of a question put in the course of an otherwise valid Congressional inquiry, as this one is recognized to have been, we should not insist that the inquiring committee follow stricter rules than the courts themselves apply in determining, for example, the sufficiency of a plea of self-incrimination under the "link in the chain" rule, see, *e. g.,* *Blau* v. *United States,* 340 U. S. 159, or in judging "materiality" in a perjury case, see, *e. g., Carroll* v. *United States, supra.* In reversing this conviction, I think the Court has strayed from the even course of decision.

I would affirm.

MR. JUSTICE WHITTAKER, whom MR. JUSTICE CLARK joins, dissenting.

I must say, with all respect, that I think the Court has grossly misread this record. For, after studying and analyzing it, it seems entirely clear to me that not only did petitioner fail to complain of any uncertainty about the subject under inquiry, or object that the questions put to him were not pertinent to the inquiry, but, moreover, at least three of the questions he refused to answer were, on their face, clearly pertinent to the inquiry as a matter of law. Demonstration of these facts can be made only by carefully setting forth in detail the undisputed relevant facts in the record. I now turn to that task.

Acting under the statutory command of Congress to investigate and report to it on the extent, character and objects of "un-American propaganda activities," the "diffusion . . . of subversive . . . propaganda," and "all other questions in relation thereto that would aid

Congress in any necessary remedial legislation," [1] a Sub-
committee of the House Committee on Un-American
Activities conducted investigatory hearings at Albany,
New York, on April 7, 8 and 9, 1954, relative to Commu-
nist subversive activities. At those hearings evidence was
adduced, principally by the testimony of a former grad-
uate student of the School of Industrial and Labor Rela-
tions of Cornell University, one Marqusee, and by one
Richardson, a former student in the Cornell Law School,
that a Communist cell existed in that University from
1947 through 1953. Those witnesses testified that they
were members of that cell, and, in addition to holding fre-
quent secret meetings and occasionally passing out hand-
bills at strike scenes, the members of the cell formulated
and carried out a plan of using the prestige and innocent
aid of the university's placement service in getting
summer jobs with labor unions in upper New York—par-
ticularly, Ithaca, Schenectady and Syracuse—where, by
fellow Communists, they were put in contact with the
leaders of Communist cells in the unions and there further
carried on their Communist activities. Richardson—who
was in fact an employee of, and regularly reported to, the
Federal Bureau of Investigation—testified that there were
at least six members of the Cornell cell and that one
of the most active members of it was petitioner,
Deutch, and that another was one Homer Owen.
Richardson further testified that, in 1952 and 1953,
Deutch was the liaison between an undisclosed member
of the Cornell faculty and that cell; that, in that period,
Deutch collected for and turned over to the cell various
contributions, including one for $100, but declined to
name the donor.

---

[1] Legislative Reorganization Act of 1946, 60 Stat. 812, 828. Rule
XI (1)(q)(2), Rules of the House of Representatives. H. Res. 5,
83d Cong., 1st Sess., 99 Cong. Rec. 15. And see pp. 18, 24.

Having this and other similar information, the Subcommittee determined to interrogate Deutch, and, locating him in the graduate school of the University of Pennsylvania in Philadelphia, it caused him to be subpoenaed to appear before the Subcommittee at Albany on Friday, April 9, 1954. But, at the request of petitioner's counsel, and for petitioner's convenience, the Subcommittee agreed to take petitioner's testimony in executive session at Washington, D. C., on Monday, April 12, instead of at Albany on Friday, April 9.

At the appointed time, petitioner, accompanied by his counsel, appeared before the Subcommittee in Washington and was sworn and interrogated. After asking and obtaining his name, place and date of birth, and his educational background, the committee advised petitioner that the particular aspect of Communist infiltration into the educational and labor fields to be inquired into in his interrogation was the existence and nature of ". . . a Communist Party group or cell operating among undergraduates . . . [and] graduates at Cornell . . . ." Specifically, counsel for the committee stated:

"Mr. Deutch, during hearings at Albany last week, the committee heard testimony regarding the existence of a Communist Party group or cell operating among undergraduates at Cornell University, among certain graduates at Cornell and in the city of Ithaca.

"In connection with that testimony, the committee was informed that you were a member of one or more of those groups. If so, I would like to ask you [about] certain matters relating to your activity there."

The subject under inquiry, so stated, would appear to have been thus made quite plain. It appears to have been entirely plain to petitioner and his counsel, as neither of them then, or at any time during the hearing, mani-

478

fested any want of understanding of the subject or asked for any further explanation of it.

Thereupon the following immediately occurred:

"[Mr. Tavenner—counsel for the Committee]: Were you a member of a group of the Communist Party at Cornell?

"Mr. Deutch: I will answer that question, but only under protest.

"I wish to register a challenge as to the jurisdiction of this committee under Public Law 601, which is the committee's enabling legislation. This question, or any similar questions involving my associations, past or future, I am answering, but only under protest as to its constitutionality. But, under your jurisdiction as stated, I answer yes, I was a member of the Communist Party.

"Mr. Tavenner: The committee was advised that a witness by the name of Ross Richardson has stated that you acted as liaison between a Communist Party group on the campus and a member of the faculty at Cornell, and that you knew the name of the member of that faculty, who was a member of the Communist Party.

"Will you tell us who that member of the faculty was?

"Mr. Deutch: Sir, I am perfectly willing to tell about my own activities, but do you feel I should trade my moral scruples by informing on someone else?

.        .        .        .        .

"Mr. Jackson [the acting chairman of the Subcommittee]: That is entirely beside the point. You have been asked a question and we must insist that you answer the question or decline to answer it, and

your declination must consist of something more than your moral scruples.

"Mr. Deutch: As to details of that, I think the whole question has been magnified more than it should have.

"Mr. Jackson: There is a question pending and the Chair must insist that you answer the question that has been asked.

"Mr. Deutch: I can only say that whereas I do not want to be in contempt of the committee, I do not believe I can answer questions about other people, but only about myself.

"Mr. Jackson: You therefore refuse to answer the question that is pending, is that correct?

"Mr. Deutch: Yes, sir . . . ."

Petitioner's refusal to answer that question resulted in Count One of his subsequent indictment.

A colloquy then ensued between petitioner and the acting chairman and another member of the Subcommittee, at the conclusion of which petitioner stated: "The only thing I am saying, sir, my challenge is, is it constitutional under Public Law 601?"

Thereupon the following occurred:

"Mr. Tavenner: The committee received testimony from Ross Richardson to the effect that you collected certain donations for the benefit of the Communist Party, and that on one occasion you delivered to him the sum of $100, without designating to him the source of it. Will you tell the committee, please, the source of that $100 contribution, if it was made?

"Mr. Deutch: No; this contribution was made—I believe I gave you the reason why I decline to answer regarding names, and this was from a personal friend."

In reply to the acting chairman's direction to answer the question, petitioner stated:

"Mr. Deutch: I feel like I can't answer that question. I realize there are many problems facing me, and it wasn't an easy decision to make.

"Mr. Jackson: The Chair directs again that you answer.

"Mr. Deutch: I am unable to.

"Mr. Tavenner: . . . I want to know if you refuse to answer the question.

"Mr. Deutch: Yes, sir."

Petitioner's refusal to answer that question resulted in Count Two of his subsequent indictment.

The background of the question, and the question, that resulted in Count Three of the indictment are omitted, because the District Court dismissed that Count, and it is not before us.

Petitioner then refused, though directed by the acting chairman, to answer the question: "Were you acquainted with Homer Owen?" And that refusal resulted in Count Four of his subsequent indictment.

Then, after saying ". . . so when I came to college I was approached and joined [the Communist Party]," petitioner was asked and answered as follows:

"Mr. Tavenner: By whom were you approached?

"Mr. Deutch: I was approached by a student. I don't wish to give his name.

"Mr. Jackson: The witness is directed to give the name of the person by whom he was approached.

"Mr. Deutch: I decline to give the name."

Petitioner's refusal to answer that question resulted in Count Five of his indictment.

This, I submit, is a fair statement of the undisputed relevant facts, and it sets forth literally every contention, objection and reason given by petitioner at the hearing

for his refusal to answer these questions. Apart from the formal testimony of Mr. Tavenner and some documentary exhibits offered by the Government, this was the evidence that was offered and received at petitioner's contempt trial in the District Court.

I think this record provides an ample basis to support the District Court's finding that, in general, "The Committee was investigating the infiltration of Communism into educational and labor fields," 147 F. Supp., at 91, but whether or not that was the general and announced subject of the hearings is immaterial to this case, because here petitioner was told, near the beginning of his interrogation and before the relevant questions were propounded, that the subject about which the committee wished to interrogate him was "the existence of a Communist Party group or cell operating among [students] at Cornell University . . . [and] matters relating to [his] activity there." Like the Court of Appeals, I think these "quoted statements made to [petitioner] by the committee counsel and a committee member clearly indicated the object of the inquiry" of petitioner—*i. e.,* the nature and extent of Communist infiltration at Cornell—"and the pertinency of the questions [to that subject]." 108 U. S. App. D. C., at 148, 280 F. 2d, at 696.

Likewise, it seems entirely clear to me, as it did to the Court of Appeals, that not only did petitioner fail to object to any question on the ground of pertinency but "Never once did he indicate unawareness of the purpose of the hearing, or doubt as to the pertinency of the questions." 108 U. S. App. D. C., at 146, 280 F. 2d, at 694. It also seems plain to me, as it did to the Court of Appeals, that petitioner "declined to answer the questions, not on the ground of pertinency [but rather on the ground] that it was against his 'moral scruples' to answer questions about other people." 108 U. S. App. D. C., at 147, 280 F. 2d, at 695. "Nor," as said by the Court of Appeals, "did he claim that he did not understand how the ques-

tions related to the subject under inquiry, or what that subject was. On the contrary, it is quite obvious that he recognized that the questions were pertinent to the subject under inquiry, and he based his refusal to answer solely and simply on the fact that he did not wish to give the names of other persons . . . [and] [n]ot until the trial in the District Court, in what appears to be after-thought, did appellant raise the questions of pertinency and unawareness of the subject matter of the inquiry." 108 U. S. App. D. C., at 147–148, 280 F. 2d, at 695–696. It thus seems clear to me, as it did to the Court of Appeals, that "the Government has proved beyond a reasonable doubt that the subject under inquiry and the pertinency of the questions were made to appear at the committee hearing with 'indisputable clarity.'" 108 U. S. App. D. C., at 147, 280 F. 2d, at 695.

Yet this Court now reverses the findings and judg-ments of the two courts below upon the sole ground "that the Government at the trial failed to carry its burden of proving the pertinence of the questions." I am com-pelled by the evidence, respectfully, to disagree.

Here, whether or not petitioner was told or knew that the general subject of the inquiry was "infiltration of Communism into educational and labor fields," he was specifically told that the committee had information that he had recently been a member of a Communist cell at Cornell, had acted as the liaison between an undisclosed member of the faculty and that cell, had collected and turned over to the cell monies from donors whom he re-fused to identify; and, then, coming specifically to the particular subject about which the committee desired to interrogate him, petitioner was told that the committee wished to interrogate him about "a Communist Party group or cell operating among undergraduates . . . [and] . . . graduates at Cornell and in the city of Ithaca" and "matters relating to [his] activity there." In the second place, the subject under inquiry, thus stated, was not only

crystal clear but appears to have been entirely plain to petitioner and his counsel, as neither of them then, or at any time during the hearing, manifested any want of understanding of the subject or asked for any further explanation of it. In the third place, neither petitioner nor his counsel made any objection, or even hinted any objection, to any question put to petitioner at the hearing on the ground of pertinency. Instead, petitioner said: "The only thing I am saying, sir, my challenge is, is it constitutional under Public Law 601?" And, finally, at the trial the Government proved this specific committee purpose by introducing into evidence not only the record made at the hearing but also the testimony of the Committee's counsel as to these matters. It is, therefore, passing strange that the Court is unable to find any proof of pertinency of the questions.

In *Watkins* v. *United States,* 354 U. S. 178, the witness had expressly "objected to the questions on the grounds of lack of pertinency" (*id.,* at 214), and the committee failed to clarify that matter. Hence, we said: "Unless the subject matter has been made to appear with undisputable clarity, it is the duty of the investigative body, *upon objection of the witness on grounds of pertinency,* to state for the record the subject under inquiry at that time and the manner in which the propounded questions are pertinent thereto." *Id.,* at ·214–215. (Emphasis added.) Here, as stated, not only was pertinency made to appear with "undisputable clarity," but moreover petitioner and his counsel gave every indication to the committee that they were aware of the subject under inquiry and made no objection whatever on the ground of pertinency.

In *Barenblatt* v. *United States,* 360 U. S. 109, the witness had said at the hearing, "I might wish to . . . challenge the pertinency of the question to the investigation," and at another point, in a lengthy written statement, he quoted from this Court's opinion in *Jones* v. *Securities &*

*Exchange Comm'n,* 298 U. S. 1, language relating to a witness' right to be informed of the pertinency of questions asked him by an administrative agency, and then contended in this Court that his conviction for contempt of Congress should be reversed because the subject of the inquiry and the relevancy of the questions thereto were not made clear. In rejecting that claim, and in contrasting that situation from the one existing in the *Watkins* case, we said: "These statements cannot, however, be accepted as the equivalent of a pertinency objection. At best they constituted but a contemplated objection to questions still unasked, and buried as they were in the context of petitioner's general challenge to the power of the Subcommittee they can hardly be considered adequate, within the meaning of what was said in *Watkins, supra,* at 214–215, to trigger what would have been the Subcommittee's reciprocal obligation had it been faced with a pertinency objection." 360 U. S., at 123–124.

I also think that this Court's decision in *United States* v. *Bryan,* 339 U. S. 323, is highly relevant to this question. For it is as true here, as it was there, that if petitioner did not understand the subject under inquiry or believed that the questions put to him were not relevant to that subject, "a decent respect for the House of Representatives, by whose authority [he was being questioned], would have required that [he] state [his] reasons for [refusing answers to the questions]." *Id.,* at 332. Such an objection would have given the Subcommittee an opportunity to avoid the blocking of its inquiry by a further and even more detailed explanation of the subject under inquiry and the manner in which the propounded questions were pertinent thereto. "To deny the Committee the opportunity to consider [such an] objection or remedy it is in itself a contempt of its authority and an obstruction of its processes. See *Bevan* v. *Kreiger,* 289 U. S. 459, 464–465 (1933)." 339 U. S., at 333. Petitioner's failure to

make any such objection at the hearing, but raising it, for the first time, at his contempt trial, was patently an attempted "evasion of the duty of one summoned . . . before a congressional committee[, and] cannot be condoned." *Id.,* at 333. And see *McPhaul* v. *United States,* 364 U. S. 372, 379.

This alone should be, and is for me, a complete answer to petitioner's claim, and to the Court's holding, "that the Government at the trial failed to carry its burden of proving the pertinence of the questions."

But, in addition, at least the questions involved in Counts One, Two and Five of the indictment were, on their face, clearly pertinent to the inquiry as a matter of law.[2] Petitioner had been specifically told that the particular subject upon which he was to be interrogated was "the existence of a Communist Party group or cell operating among undergraduates . . . [and] graduates at Cornell and in the city of Ithaca," and "matters relating to [his] activity there." Surely the questions involved in Counts One, Two and Five of the Indictment were, on their face, clearly pertinent to that subject. One cannot profitably elaborate a truth so plain. *Barenblatt* v. *United States,* 360 U. S. 109, 123–125. And see *McPhaul* v. *United States,* 364 U. S. 372, 380–381.

For these reasons, I am bound to think that the two courts below were right, and that the judgment should be affirmed.

---

[2] Inasmuch as a general sentence was imposed on the four counts of no more than the law allows to be imposed on any one count, it follows that if any one of the four counts was adequately proved by the Government the judgment must be affirmed. *Barenblatt* v. *United States, supra,* at 126, note 25.