# GOJACK *v.* UNITED STATES.

No. 594.   Argued April 21, 1966.—Decided June 13, 1966.

*Frank J. Donner* argued the cause for petitioner. With him on the brief were *Edward J. Ennis, Osmond K. Fraenkel, Melvin L. Wulf* and *David Rein.*

*Assistant Attorney General Yeagley* argued the cause for the United States. With him on the brief were *Solicitor General Marshall, Richard A. Posner, Kevin T. Maroney* and *Robert L. Keuch.*

Mr. Justice Fortas delivered the opinion of the Court.

This case is a sequel to this Court's decision in *Russell* v. *United States,* 369 U. S. 749, and companion cases. One of those cases related to the same person who is petitioner here and to the same events.

Petitioner appeared before a Subcommittee of the House Committee on Un-American Activities on February 28 and March 1, 1955. He answered certain questions, but refused to answer others concerning his affiliation with the Communist Party, the affiliation of others, and his connection with a "Peace Crusade." He had challenged the jurisdiction of the Committee and the Subcommittee, the authorization of each, and the constitutionality of the inquiry in general and with specific ref-

erence to the questions which he declined to answer.[1] He did not and does not invoke the Fifth Amendment.

He was indicted for contempt of Congress under Rev. Stat. § 102, as amended, 52 Stat. 942, 2 U. S. C. § 192 (1964 ed.) [2] (hereafter, § 192) as a result of his refusals to answer. He was convicted. In *Russell* v. *United States, supra,* this Court reversed, holding that the indictment was defective because it did not allege the "subject under inquiry." The Court noted that under § 192 specification of the subject of the inquiry is fundamental to a charge of violating its provisions. Absent an allegation of the subject matter of the inquiry, this Court held, there is no way in which it can be determined whether the factual recitals of the indictment charged a crime under § 192—that is, a refusal to answer questions

---

[1] At the outset of the hearings, petitioner's counsel filed a motion which asked that the subpoenas be vacated and the hearings "set aside" on the grounds, among others, that the Committee was not engaged in "a legislative investigation for a *bona fide* legislative purpose," but rather in an effort to destroy the labor union of which petitioner was an officer; that the "committee's basic resolution" is unconstitutional because "no person can determine from it the boundaries of the Committee's power," and that in any event it did not authorize this investigation; and that the First Amendment forbids compulsory disclosure of political beliefs and affiliations.

[2] This provision, enacted in 1857, now (with minor changes) reads as follows:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

"pertinent to the inquiry," and within the legislative competence of Congress.[3]

Petitioner was thereafter re-indicted. The deficiency in the first indictment was sought to be cured by a recital that "[t]he subject of these hearings was Communist Party activities within the field of labor . . . ." Petitioner was again convicted and given a general sentence of three months' imprisonment and a $200 fine. The Court of Appeals for the District of Columbia Circuit affirmed *per curiam*. 121 U. S. App. D. C. 126, 348 F. 2d 355 (1965). We granted certiorari. 382 U. S. 937. We reverse. It is now clear that the fault in these proceedings is more fundamental than the omission from the indictment of an allegation of the "subject of the inquiry" being conducted by the Subcommittee. The subject of the inquiry was never specified or authorized by the Committee, as required by its own rules, nor was there a lawful delegation of authority to the Subcommittee to conduct the investigation.

Petitioner here urges that we reconsider this Court's decision in *Barenblatt* v. *United States,* 360 U. S. 109. In *Barenblatt* this Court upheld the authority of the

---

[3] The leading case on the requirement of legislative purpose is *Kilbourn* v. *Thompson,* 103 U. S. 168. *Kilbourn* did not arise under § 192, but was a damage suit arising out of a direct exercise by the House of Representatives of a claimed power to punish for contempt. The Court held that since the subject matter of the investigation had not been legislative in character, the order of contempt of the House, directing its Sergeant-at-Arms to imprison the contumacious witness, afforded the Sergeant no protection from liability. See, for cases under § 192, *In re Chapman,* 166 U. S. 661, 667–670; *McGrain* v. *Daugherty,* 273 U. S. 135, 173–180; *Sinclair* v. *United States,* 279 U. S. 263, 291–295; *Quinn* v. *United States,* 349 U. S. 155, 160–161; *Watkins* v. *United States,* 354 U. S. 178, 187, 200; *Barenblatt* v. *United States,* 360 U. S. 109, 133; *Wilkinson* v. *United States,* 365 U. S. 399, 410–412. See also note 6, *infra*.

Committee to investigate Communist infiltration into the field of education. In the circumstances of that case, the Court sustained the constitutionality of the investigation and of the Committee's inquiry into petitioner's alleged membership in the Communist Party. Since we decide the present case on other grounds, it is not necessary nor would it be appropriate to reach the constitutional question.

## I.

Rule I of the Rules of Procedure of the House Committee on Un-American Activities provides that "No major investigation shall be initiated without approval of a majority of the Committee." Rule XI, par. 26, of the Rules of the House of Representatives requires each Committee of the House to keep a record of all committee actions. There is no resolution, minute or record of the Committee authorizing the inquiry with which we are concerned.

The Solicitor General's brief in this Court states that: "Admittedly,. there is no direct evidence that the Committee approved the investigation of Communist activities in the field of labor of which the hearings at which petitioner was called to testify were a part." A footnote to this statement concedes that "We do not dispute that this investigation was a 'major' one and that approval by a majority of the Committee was therefore required."

The Government's only plea in avoidance of this obvious deficiency is that we should "infer" Committee approval of the inquiry at which petitioner was required to respond to questions, because it was part of the Committee's alleged "continuing investigation" of Communist activities in the labor field.[4] But this is clearly imper-

---

[4] There is some evidence in the record that the House Committee had "intermittently" (Brief for the United States, p. 4) investigated the union of which petitioner was an officer as a part of its alleged

missible. We are not here dealing with the justification for an investigation by a committee of the Congress as a matter of congressional administration. That is a legislative matter. We are here concerned with a criminal proceeding. It is clear as a matter of law that the usual standards of the criminal law must be observed, including proper allegation and proof of all the essential elements of the offense.[5] Moreover, the Congress, in enacting § 192, specifically indicated that it relied upon the courts to apply the exacting standards of criminal jurisprudence to charges of contempt of Congress in order to assure that the congressional investigative power, when enforced by penal sanctions, would not be abused.[6]

"continuing investigation." However, nowhere in the record does any authorization of such a continuing investigation appear. In any event, the authorization of a "major investigation" by the full Committee must occur during the term of the Congress in which the investigation takes place. Neither the House of Representatives nor its committees are continuing bodies. Cf. *Anderson* v. *Dunn,* 6 Wheat. 204, 231; *Marshall* v. *Gordon,* 243 U. S. 521, 542. It is the practice of the House to adopt its Rules—including the Rule which establishes the Un-American Activities Committee and defines the scope of its authority—at the beginning of each Congress. See, *e. g.,* 109 Cong. Rec. 14, 88th Cong., 1st Sess. (1963); 101 Cong. Rec. 11, 84th Cong., 1st Sess. (1955).

[5] See, *e. g., Watkins* v. *United States,* 354 U. S. 178, 208; *Russell* v. *United States,* 369 U. S. 749, 755; *United States* v. *Lamont,* 18 F. R. D. 27, 37 (D. C. S. D. N. Y. 1955), aff'd, 236 F. 2d 312 (C. A. 2d Cir. 1956).

[6] For example, in connection with the debates on § 192, Senator Bayard, who bore the brunt of the argument for the bill in the Senate, said: "It is a rule of law very well settled, that if there is no jurisdiction over the subject-matter, the proceeding is void. In such a case, of course, a court of justice would decide that the witness could not be compelled to answer for want of jurisdiction." Cong. Globe, 34th Cong., 3d Sess., p. 439 (1857). See also *id.,* at 439–440.

In *Russell,* this Court said, "The obvious consequence [of the Congressional purpose in § 192], as the Court has repeatedly empha-

It can hardly be disputed that a specific, properly authorized subject of inquiry is an essential element of the offense under § 192. In *Russell,* this Court held that the definition of the subject under inquiry is "the basic preliminary question which the federal courts . . . [would] have to decide in determining whether a criminal offense had been alleged or proved." "Our decisions have pointed out that the obvious first step in determining whether the questions asked were pertinent to the subject under inquiry is to ascertain what that subject was." 369 U. S., at 756–757, 758–759. See also *Wilkinson* v. *United States,* 365 U. S. 399, 407–409; *Deutch* v. *United States,* 367 U. S. 456, 467–469; *Watkins* v. *United States,* 354 U. S. 178, 208–215; *Sinclair* v. *United States,* 279 U. S. 263, 295–296. In *United States* v. *Rumely,* 345 U. S. 41, Mr. Justice Frankfurter observed that the resolution defining the subject of a committee's inquiry is the committee's "controlling charter" and delimits its "right to exact testimony." 345 U. S., at 44. Cf. *Sinclair* v. *United States,* 279 U. S. 263, 295–298. This Court made it clear in *Watkins* v. *United States,* 354 U. S. 178, 201, 206, that pertinency is a "jurisdictional concept" and it must be determined by reference to the authorizing resolution of an investigation. The House Committee on Un-American Activities has itself recognized the fundamental importance of specific authorization by providing in its Rule I that a major inquiry must be initiated by vote of a majority of the Committee. When a committee rule relates to a matter of such importance, it must be strictly observed. *Yellin* v. *United States,* 374 U. S. 109. Since the present inquiry is concededly part of a "major investigation" and

sized, was to confer upon the federal courts the duty to accord a person prosecuted for this statutory offense every safeguard which the law accords in all other federal criminal cases." 369 U. S., at 755.

the Committee did not authorize it as required by its own Rule I, this prosecution must fail.  There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry which was never properly authorized.

Indeed, the present case illustrates the wisdom of the Committee's Rule requiring specific authorization of a major investigation.  Here, in the absence of official authorization of a specific inquiry, statements were made as to the subject and purpose of the inquiry which, to say the least, might have caused confusion as to the subject of the investigation, and might well have inspired respectable doubts as to legal validity of the Committee's purposes.[7]  A brief recapitulation of the relevant facts will demonstrate this:

1. On November 19, 1954, about a month and a half before appointment of the Subcommittee, the Chairman of the Committee was reported as having announced that "large public hearings in industrial communities" would be held to expose active Communists as part of "a new plan for driving Reds out of important industries." [8]

---

[7] In the absence—as here—of any specific authorization of the inquiry and in view of the broad and conflicting statements of the committee members as to the purpose of the inquiry, the present case presents a formidable problem of the "vice of vagueness" which troubled the Court in *Watkins,* 354 U. S., at 209.  We do not reach that problem because we decide the case on other grounds.

[8] The record contains the following news account, the accuracy of which was not controverted:

"Rep. Francis E. Walter (D., Pa.), who will take charge in the new Congress of House activities against communists and their sympathizers, has a new plan for driving Reds out of important industries.

"He said today he plans to hold large public hearings in industrial communities where subversives are known to be operating, and to give known or suspected commies a chance in a full glare of pub-

2. On February 14, when a representative of petitioner's union appeared to request a postponement, the Chairman of the Committee stated that "all of us are interested in seeing your union go out of business." A similar statement by the Chairman of the Subcommittee was reported in the press on February 15.

3. On February 21, the record shows that a newspaper in St. Joseph, Michigan, reported a statement of the Committee Chairman that the hearing would expose petitioner and another subpoenaed witness as "card carrying Communists" and that "The rest is up to the community." The story noted that the rescheduled hearing would precede by three days a representation election, involving the union, at St. Joseph.

4. Near the close of the testimony of the first witness at the hearing, the Chairman and other members of the Subcommittee disavowed any effort "to break or bust unions," but added that the Committee's purpose was to expose and break up Communist control of unions.

5. At one point in the hearing, the member of the Subcommittee who was then presiding stated that the purpose of the hearing was to consider testimony relating to Communist Party activities within the field of labor, but

---

licity to deny or affirm their connection with a revolutionary conspiracy—or to take shelter behind constitutional amendments.

"By this means, he said, active communists will be exposed before their neighbors and fellow workers, 'and I have every confidence that the loyal Americans who work with them will do the rest of the job.'

.    .    .    .    .

"Hearings of a similar nature have been held in local areas, but Rep. Walter wants to make them bigger, with the public being urged as well as invited to attend.

" 'We will force these people we know to be communists to appear by the power of subpena,' Rep. Walter said, 'and will demonstrate to their fellow workers that they are part of a foreign conspiracy.' "

went on to refer to other purposes. He said that the hearing would also consider "the circumstances under which members of the Communist Party in the United States were recruited for military service in the Spanish Civil War, and to ascertain the method used by the Communist Party in securing assistance from the medical profession in carrying out its objectives."

We do not characterize these statements or appraise their legal effect. They are relevant here only to demonstrate the insuperable hurdle of "inferring," as the Government suggests, the authorization of the inquiry in the absence of a specific statement and the particularized authorization required by the Committee's own rules. Obviously, some of the statements made as to the Committee's purposes exceed the bounds which would be enforced by criminal sanctions,[9] and others do not correspond to the allegation in the second indictment that the subject of the inquiry was "Communist Party activities within the field of labor."

It should be noted that Rule I of the Committee has a special significance in the case of the House Un-American Activities Committee. The Committee is a standing committee of the House, not a special committee with a specific, narrow mandate. Its charter is phrased in

---

[9] This Court has emphasized that there is no congressional power to investigate merely for the sake of exposure or punishment, particularly in the First Amendment area. In *Watkins* v. *United States*, 354 U. S. 178, the Court stated:

"We have no doubt that there is no congressional power to expose for the sake of exposure." *Id.*, at 200.

"There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress. . . . Investigations conducted solely . . . to 'punish' those investigated are indefensible." *Id.*, at 187.

See also cases cited at note 3, *supra;* and see note 6, *supra.*

exceedingly broad language. It is authorized to make investigations of un-American and subversive "propaganda" and "propaganda activities" and "all other questions in relation thereto that would aid Congress in any necessary remedial legislation." To support criminal prosecution under § 192, this generality must be refined as Rule I contemplated. Otherwise, it is not possible for witnesses to judge the appropriateness of questions addressed to them, or for the Committee, the Congress, or the courts to make the essential judgment which § 192 requires: whether the accused person has refused "to answer any question pertinent to the question under inquiry." [10]

It now appears that the investigation and the "question under inquiry" in petitioner's case were neither properly authorized nor specifically stated. Nor was the purpose of the inquiry clearly understood, apparently, even by the members of the Subcommittee themselves. Although at the outset of the hearings the Subcommittee Chairman did allude to "Communist Party activities within the field of labor" as the subject matter under investigation, statements and declarations of Committee members were at variance with this purported purpose. The recital in the second and revised indictment that it was "Communist Party activities within the field of labor" was therefore based on quicksand. Obviously, this Court's decision in *Russell* cannot be satisfied by a mere statement in the indictment, having no underpinning in an authorizing resolution, that the recited subject was in fact the subject of the inquiry. *Russell* called for more than a draftsman's exercise.

---

[10] In *Watkins*, 354 U. S., at 200–216, this Court considered the bearing upon the statutory requirement of pertinency of the Committee's status as a standing committee, of its vague charter, and of failure to define the scope of its activities within that charter.

## II.

There is in this case another fatal defect. The hearings in which petitioner was called to testify were before a Subcommittee of the House Committee on Un-American Activities. Pursuant to Committee authorization, the Chairman on February 9, 1955, appointed a Subcommittee of three members to conduct hearings at which three named witnesses, including petitioner, were to be called. Neither the resolution nor any minutes or other records of the Committee stated the subject matter committed to the Subcommittee or otherwise described or defined its jurisdiction in terms of subject matter.[11]

---

[11] The indictment refers to Committee action taken on three dates, and the proof at trial provided no other source of authority for the Subcommittee. None of these designates or describes the subject matter of the inquiry or authorizes the subcommittee to conduct it. The Committee's minutes for these three dates are as follows:

On January 20, 1955, the House Committee authorized its Chairman

"from time to time to appoint subcommittees composed of three or more members of the Committee on Un-American Activities, at least one of whom shall be of the minority political party, and a majority of whom shall constitute a quorum, for the purpose of performing any and all acts which the Committee as a whole is authorized to perform."

Thereafter, on February 9, a meeting of the House Committee was held, the minutes of which record the following:

"Mr. Scherer moved that David Mates and John Gojack be subpenaed to appear before a subcommittee of the Committee on Internal Security [sic] in open hearing at Fort Wayne, Indiana; and that a Dr. Scharfman [sic—Dr. Shafarman] be subpenaed to appear in executive session at Fort Wayne, Indiana. The Chairman designated Mr. Moulder, Mr. Doyle, and Mr. Scherer as a subcommittee to conduct the hearings in Fort Wayne, Indiana, and set the time at February 21, 1955."

The House Committee met again on February 23, and the following took place:

"The hearings scheduled to be held at Fort Wayne, Indiana, were discussed. The Chairman stated that upon learning that a National

Once again, we emphasize that we express no view as to the appropriateness of this procedure as a method of conducting congressional business. But, once again, we emphasize that we must consider this procedure from the viewpoint not of the legislative process, but of the administration of criminal justice, and specifically the application of the criminal statute which has been invoked.

Viewed in this perspective, the problem admits of only one answer. Courts administering the criminal law cannot apply sanctions for violation of the mandate of an agency—here, the Subcommittee—unless that agency's authority is clear and has been conferred in accordance with law.

We do not question the authority of the Committee appropriately to delegate functions to a subcommittee of its members, nor do we doubt the availability of § 192 for punishment of contempt before such a subcommittee in proper cases. But here, not only did the Committee fail to authorize its own investigation, but also it failed to specify the subject of inquiry that the Subcommittee was to undertake. The criminal law cannot be used to implement jurisdiction so obtained, without metes and bounds, without statement or description of the subject committed to the Subcommittee. *United States* v. *Seeger,* 303 F. 2d 478 (C. A. 2d Cir. 1962). Cf. *United States* v. *Lamont,* 18 F. R. D. 27 (D. C. S. D. N. Y. 1955), aff'd, 236 F. 2d 312 (C. A. 2d Cir. 1956). In *Seeger,* a contempt conviction had been obtained for

Labor Board election was to be held in Fort Wayne on February 24, he continued the hearings until February 28 and set the place for the hearings in Washington, D. C. Mr. Scherer moved that the Committee hold hearings at a subsequent date in Fort Wayne. The motion died for want of a second. The Committee agreed that after the hearings on February 28 it would then be determined whether further hearings in Fort Wayne would be necessary."

refusal to answer questions of a subcommittee. The resolution establishing the Subcommittee, like that in the present case, announced the date for the hearing and stated the Subcommittee's members, but stated no subject matter. As Judge Moore, concurring, put it:

"Even the most liberal construction cannot transform . . . [this] into a resolution of the Committee vesting its authority in a subcommittee . . . ." 303 F. 2d, at 487.

See also *United States* v. *Kamin,* 136 F. Supp. 791 (D. C. D. Mass. 1956).

We need not consider whether the Committee, by express resolution, might have delegated all of its authority to the Subcommittee. It did not attempt this, nor did it otherwise specify the subject matter as to which the Subcommittee was authorized to act.[12] Accordingly, even if we were able to establish proper authorization by the Committee itself pursuant to Rule I to conduct the inquiry at which the questions were asked which petitioner refused to answer, this prosecution would fail. The jurisdiction of the courts cannot be invoked to impose criminal sanctions in aid of a roving commission. The subject of the inquiry of the specific body before which the alleged contempt occurred must be clear and certain. As Chief Judge Clark stated in *United States* v. *Lamont, supra,* at 315, it is necessary to "[link] the inquiry conducted by the subcommittee to the grant of authority dispensed to its parent committee."

---

[12] The action of the full Committee in reporting petitioner's contempt to the House, and the House's action in certifying the contempt to the United States Attorney for prosecution, cannot be taken as retroactive authorization of the investigation and definition of the delegated authority. Petitioner's "duty to answer must be judged as of the time of his refusal." *United States* v. *Rumely,* 345 U. S. 41, 48.

Reference to § 192 emphasizes the importance of this requirement. The statute requires that a witness, to be found guilty of contempt, must have "been summoned as a witness *by the authority of either House of Congress* to give testimony . . . *upon any matter under inquiry before either House* . . . ." The authority being exercised is that of the House of Representatives. See *Watkins,* 354 U. S., at 200–205. It is the investigatory power of the House that is vindicated by § 192. The legislative history of § 192 makes plain that a clear chain of authority from the House to the questioning body is an essential element of the offense.[13] If the contempt occurs before a subcommittee, the line of authority from the House to the Committee and then to the subcommittee must plainly and explicitly appear, and it must appear in terms of a delegation with respect to a particular, specific subject matter. As Judge Weinfeld stated in *United States* v. *Lamont, supra,* at 32,

"No committee of either the House or Senate, and no Senator and no Representative, is free on its or his own to conduct investigations unless authorized. Thus it must appear that Congress empowered the Committee to act, and further that at the time the witness allegedly defied its authority the Committee was acting within the power granted to it."

Absent proof of a clear delegation to the Subcommittee of authority to conduct an inquiry into a designated subject, the Subcommittee was without authority which can be vindicated by criminal sanctions under § 192, nor

---

[13] See Cong. Globe, 34th Cong., 3d Sess., particularly at pages 406, 409–410, 427, 435 (1857). See also *Watkins* v. *United States,* 354 U. S. 178, 200–201.

was there an authoritative specification of the "subject matter of the inquiry" necessary for the determination of pertinency required by the section.

For the foregoing reasons, the judgment below is

*Reversed.*

While concurring in the Court's judgment and opinion, MR. JUSTICE BLACK would prefer to reverse the judgment by holding that the House Un-American Activities Committee's inquiries here amounted to an unconstitutional encroachment on the judicial power for reasons stated in his dissent in *Barenblatt* v. *United States,* 360 U. S. 109, 135.